THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* PHILIP PESKY, Appellant.*

First Department, June 23, 1930.

K. *Henry Rosenberg*, for the appellant.

*John C. McDermott, Deputy Assistant District Attorney*, of counsel [*Thomas C. T. Crain, District Attorney*], for the respondent.

MARTIN, J.   The information herein charged that on October 7, 1929, the defendant, in the county of New York, unlawfully possessed a book called " Hands Around " with intent to sell and show the same, and which was a lewd, lascivious, indecent, obscene and disgusting book.

The defendant pleaded not guilty to the crime charged, and thereafter on November 18, 1929, was arraigned for trial before the Court of Special Sessions.   At the conclusion of the trial a motion was made to acquit and the court reserved decision.   Subsequently and on December 9, 1929, the court decided that the book " Hands Around " was an indecent book and that its sale constituted a violation of section 1141 of the Penal Law, one judge dissenting.

On January 17, 1930, the appellant was arraigned for judgment and the court suspended sentence.   For the purpose of appeal, the suspension of sentence is deemed to be a judgment.   (Code Crim. Proc. § 517.)   As stated above, a motion was made at the close of the case to acquit and set aside the determination of the court convicting appellant, and an exception was taken to the denial of that motion.   These exceptions raise the question of law presented herein.

On this appeal it is conceded that the facts in the case are uncontradicted.   The defendant Philip Pesky testified that he was employed at Schulte's book store; that he did not know how this particular book came to be on sale in the store, and he swore that he never read the book and did not know its contents.

The appellant contends that the book " Hands Around " is not an indecent or obscene book, hence its possession and sale did not violate the law.   He further contends that the book was written by a well-known scholar; that it contains ten dialogues with life of to-day; that they are literary and psychological studies; that they are free from vulgar details, with no effort to " exploit prurient curiosity," and that the book has no tendency " to excite lustful and lecherous desire."   In effect, the appellant contends that there is no recital of any facts which come within the condemnation of the statute.

It is unnecessary to recite the details of each episode in the cycle set forth in this book.   The first commences with a prostitute

and the last ends with a prostitute. The first begins with the prostitute soliciting a soldier; the second deals with a soldier and a parlor maid; the third with the parlor maid and a young man whose parents are absent in the country; the fourth with this young man and a young wife; the fifth with the young wife and her husband; the sixth with the young husband and a sweet young miss; the seventh with this young miss and a poet; the eighth with the poet and an actress; the ninth with the actress and a count, and the tenth with the count back to the girl of the streets. The statements found in the book are sufficient to condemn it.

On the very first page we are told that this book is "*intended for private circulation only*," and on the title page appear the words "Privately Printed for Members of the Schnitzler Society." Turning to the introduction, which is the strongest condemnation that this book could have, we find the following: "Humanity seems gayest when dancing on the brink of a volcano. The culture of a period preceding a social cataclysm is marked by a spirit of light wit and sophisticated elegance which finds expression in a literature of a distinct type. * * * But the *exquisite handling of the licentious* was elaborated into a perfect technique in Eighteenth Century France * * *.

"During the closing years of the Nineteenth Century, *a similar spirit has hovered over Vienna*, when it was the last and staunchest stronghold of aristocracy in the modern world. *Its literature reflected the charm of a fastidious amatory etiquette * * *.*"

Speaking of this "amatory etiquette" it is stated that: "'Reigen' (ring), here translated as 'Hands Around,' is a series of ten comedies — miniatures in dialogue between man and woman in various ages and walks of life. But, transgressing the merely literary, they are psychological studies of the interplay of sex and keen analysis of the sophisticated modern soul, done with freedom and finesse. There are no grim questions of right and wrong in these subtle revelations of the merely human. In fact, one might call them *studies in the etiquette of the liaison and all its nuances.*"

We are then told that this cycle which the book depicts would concededly have been a vicious cycle in the hands of any lesser artist than Schnitzler. We are not told why Schnitzler is able to surpass all other writers in the exquisite handling of the licentious. That gift, however, is claimed for him by the writer of the introduction.

The above statements taken from the book show that those connected with its publication clearly appreciated that there was nothing to it except a description of the licentious. There was no attempt to point to any lesson that might be of value to any one that would read it. It was just a clear attempt to portray filthy ideas, for the book is without a single redeeming feature.

As usual it is prefaced by the remark that it will not be appreciated by the Puritan fanatic with his jaundiced inhibitions or the moral idealogist with his heart of leather. This is the usual cry of the libertine who is attempting to justify his own life or writings. Any one who differs with his method of living or writing is Puritanical. With such people clean thinking or clean living is Puritanical.

It is unnecessary to set forth the object of this book except as it is set forth in the introduction. We believe nothing more is needed than the quotation from the introduction which admits that it is "fleshy," but so treated by Schnitzler as to avoid that condemnation.

"A vicious cycle, some may say, and such it surely would have been in the hands of a lesser artist than Schnitzler, for he would only have made the book hideously fleshy, instead of a marvelous psychological study in the ecstacies and disillusions of love and the whole tragedy of human wishes, unsatisfied even in their apparent gratification. * * * All stratagems of sex are uncovered * * * through the finer eyes of a connoisseur of things human."

While we appreciate the fact that different people have different standards with reference to such writings and that these standards are often peculiar and difficult to understand, nevertheless people generally and the courts have arrived at what they consider a fair standard by which to judge such books, and protect those who need protection.

In *United States* v. *Bennett* (16 Blatchf. 338), Judges BLATCH-FORD, BENEDICT and CHOATE laid down a test on obscenity as used in the statute there under consideration. The court said (at p. 362): "It is whether the tendency of the matter is to deprave and corrupt the morals of those whose minds are open to such influences, and into whose hands a publication of this sort may fall."

The word "lewd" was there defined as "having a tendency to excite lustful thoughts," and it was said that passages in a book are "indecent within the meaning of this Act when they tend to obscenity — that is to say, matter having that form of indecency which is calculated to promote the general corruption of morals * * *. It is not a question whether it would corrupt the morals * * . * of every person. * * * It is within the law if it would suggest impure and libidinous thoughts in the young and the inexperienced."

Judge DANIELS in *People* v. *Muller* (32 Hun, 209, at 212; affd., 96 N. Y. 408) said: "The question in all these cases must be, what is the impression produced upon the mind by perusing or observing the writing or picture referred to in the indictment, and one person is as competent to determine that as another."

In *Commonwealth* v. *Buckley* (200 Mass. 346) the court said (at p. 354): " Descriptions of seductive actions and of highly wrought sexual passion, even when sanctified by what the author has called ' love,' are very likely to be seen in another light tending towards the obscene and impure. And an author who has disclosed so much of the details of the way to the adulterous bed as the author of this book has and who has kept the curtains raised in the way that she has kept them, can find no fault if the jury say that not the spiritual but the animal, not the pure but the impure, is what the general reader will find as the most conspicuous thought suggested to him as he reads."

These matters must be judged by normal people and not by the abnormal. Conditions would be deplorable if abnormal people were permitted to regulate such matters. Of course there are some people who seem to be unable to find anything obscene in anything written. It is very clear that the author of the book now before us for consideration was not thinking of the spiritual, but devoted the whole book to the animal instincts of the human race. His efforts were not a lesson in morality, nor an attempt to uplift the mind of the reader, but an attempt to depict, in a manner that might possibly be called clever, adulterous relations, vulgar and disgusting in the extreme.

While some people may think this quite smart, a book of this kind, which has nothing to recommend it, and dealing wholly with such details, is properly held to be disgusting, indecent and obscene.

It is admitted that this book deals with a distinct type of literature, a type evidently intended for certain private consumption. One sentence is sufficient to illustrate this fact: " Poet: Then it's your leading man — Benno —. Actress: Nonsense. He doesn't care for women at all — didn't you know that? He carries on with the * * *." This last quotation stamps the author as a man whose thoughts thus expressed cannot escape being characterized as indecent.

There does not appear to be any claim that it is of any value as a literary production or as an intellectual treat. No better appraisal of its value is needed than that given by the introduction. The facts show that the whole book deals with the sensual. It has no other object or purpose.

The judgment of conviction should be affirmed.

MERRELL and O'MALLEY, JJ., concur; McAVOY and SHERMAN, JJ., dissent.

McAVOY, J. (dissenting). The information charged that on October 7, 1929, in the county of New York, the defendant unlaw-

fully possessed a book called " Hands Around " with intent to sell and show the same, and which was a lewd, lascivious, indecent, obscene and disgusting book.

Section 1141 of the Penal Law reads, in part, as follows: " A person who sells   *   *   *   any obscene, lewd, lascivious, filthy, indecent or disgusting book   *   *   *   is guilty of a misdemeanor   *   *   *."

The facts in the case are uncontradicted.

The book of the play condemned at Special Sessions by a divided court is called in its original version in German " Reigen " and we may take judicial notice that it had an almost world-wide acceptance among litterateurs as of literary merit. The episodes related by the characters less deftly touched would be of a vulgar tone because of the subject and could be, if written in bawdy phrases, classed as too realistic for common reading. But nowhere is there any word in the translation which has a lewd or lascivious connotation. The appeal to passion or lechery is wholly lacking. While the trial court is the judge of the facts, it may not hold as obscene that which in common speech is not within that category.

The proof shows, too, that this publication has been on sale in the book departments of department stores, bookshops and other merchandising stores in which part of the retail business is the sale of books. It has also been advertised in the daily prints in the city. As a play in German, the work has been produced in many large European Continental cities and has been extant for at least ten years there.

We reversed a conviction for the publication of a book known as " Madeleine," which was the autobiography of a prostitute, and seems in its content more nearly approaching lewd and lascivious descriptions than anything found here. (*People* v. *Brainard*, 192 App. Div. 816.)

A receiver was directed by a former justice of this court to sell Fielding's novel, " Tom Jones," the " Works of Rabelais " and Ovid's " Art of Love " and other works of an amatory nature, whose terms and descriptions are much more likely to stimulate sexual impulses than anything in the book now here. (*Matter of Worthington Co.*, 62 N. Y. St. Repr. 116.)

Recently in the Federal court, in *United States* v. *Dennett* (39 F. [2d] 564), it was pointed out that a similar statute enacted by the Congress, designed to bar from the mails obscene publications, was never thought to bar everything which *might* stimulate sex impulses. It was said that much chaste poetry and fiction, as well as many useful medical works, would be under the ban if such were the rule. Such a statute must be construed reasonably, with a view to

attaining the general objects at which the public policy of the State is aimed, to wit, a prohibition of that which is obscene, lascivious or lewd.

We think it is no part of the duty of courts to exercise a censorship over literary productions.

We conclude that the judgment of conviction should be reversed and the information dismissed.

SHERMAN, J., concurs.

Judgment affirmed.