THE PEOPLE OF THE STATE OF NEW YORK on Complaint of SYLVESTER SAVERY, Complainant, *v.* GOTHAM BOOK MART, INC., Defendant.

City Magistrates' Court of New York, Seventh District, Borough of Manhattan, January 24, 1936.

*John S. Sumner*, for the New York Society for the Suppression of Vice, prosecuting for the People.

*Weil, Gotshal & Manges [Horace S. Manges* of counsel], for the defendant.

PERLMAN, C. M. The defendant is charged with having violated section 1141 of the Penal Law by its possession and sale of a book entitled, " If It Die," by André Gide.

Section 1141 of the Penal Law reads, in part, as follows: " A person who sells * * * any obscene, lewd, lascivious, filthy, indecent or disgusting book * * * is guilty of a misdemeanor."

Complainant does not contend that the entire book, which is an autobiography of the French novelist André Gide, is obscene within the meaning of our statute. The attack is chiefly upon part II, comprising approximately seventy-six pages, which, mathematically computed is approximately one-fifth of the entire book. Further analysis and computation establishes, however, that the complaint is directed only against certain paragraphs contained in twenty-two of these seventy-six pages.

Complainant relies mainly upon *United States* v. *Bennett* (Fed. Cas. No. 14,571), decided in 1879. There the Circuit Court of Appeals held that the offending paragraphs in a book could be taken from their context and the book judged by them alone, and that the test of obscenity was whether the tendency of these passages in themselves was " to deprave the minds of those open to such influences and into whose hands a publication of this character might come." Fifty-five years later the same court held that *United States* v. *Bennett* does not represent the law. (*United States* v. *One Book Entitled Ulysses*, 72 F. [2d] 705.)

Our Court of Appeals has also written: " No work may be judged from a selection of such paragraphs alone. Printed by themselves they might, as a matter of law, come within the prohibition of the statute. So might a similar selection from Aristophanes or Chaucer or Boccacio, or even from the Bible. The book, however, must be considered broadly, as a whole." (ANDREWS, J., in *Halsey* v. *New York Society*, 234 N. Y. 1.) It is unnecessary to add further illustrations to show that, in the administration of statutes aimed at the suppression of immoral books, works of literature have not been barred merely because they contain *some* obscene passages.

The determination of the issue involved may not, therefore, be found in the slide rule. This is the tool of the engineer. Books are not so dissected. A book does not lend itself to either mathematical or comparative analysis.

Moral standards of thought are not of a static or plastic nature. What seems immoral to one generation will not seem so to another. The heroine of the American novel is no longer the pink-aproned girl making cookies in the kitchen. Hamlet shocked all the Cromwellian Puritans, and shocks nobody today. A literary critic of the book involved in this case writes: " Perhaps it is well that the publication * * * in English has been delayed until now. For one thing, the public is no longer so horrified by disclosures of homosexuality that it need regard the book — as it might have regarded it ten years ago — as something sensational." (*New York Times*, Nov. 10, 1935.)

The idea of what constitutes morality differs, not only in different ages, but in different countries. The International Conference on the Suppression of the Circulation and Traffic in Obscene Publications readily admitted that the term obscenity has different meanings in different countries. Many years ago a superintendent of schools in Brooklyn was stirred by the recitation in our public schools of Longfellow's poem, " Building of the Ship." His

objection was based upon the fact that the ship was pictured as leaping " into the ocean's arms." In *Matter of Worthington Co.* (62 N. Y. St. Repr. 116) one of the books allowed to be sold as a "classic" was the unexpurgated edition of Decameron. In Ohio a fine was imposed by a Federal judge upon a defendant for mailing the same work. (*New York Times*, June 22, 1922.)

Opinions are bound to vary. This fact we must recognize. This difference is reflected in the decisions of our own courts. From what is the public to be protected? Who are to be protected? What test shall be applied? Shall we consider the opinion of literary critics? Are " de-luxe " editions exempt from the provisions of our law? The answers to these questions are not in accord. Judges like all human beings vary in their views.

The question, we are told, is whether the tendency of the books is to excite lustful and lecherous desire. (*People* v. *Eastman*, 188 N. Y. 478; *People* v. *Muller*, 96 id. 408.) The Appellate Division for this department applied this test in *People* v. *Brainard* (192 App. Div. 816) and reversed a conviction for the publication of a book known as " Madeleine " which was the autobiography of a prostitute. This test was called too narrow in a later case (*People* v. *Seltzer*, 122 Misc. 329.) Mr. Justice WAGNER in this case adopted the test applied in *Regina* v. *Hicklin* (L. R. 3 Q. B. 360), namely: " Is the tendency of the matter charged as obscene to deprave or corrupt those whose minds are open to such immoral influences and who might come in contact with it? " Recently, the Appellate Division for this department stated these matters must be judged by normal people and not by the abnormal. " Conditions would be deplorable if abnormal people were permitted to regulate those matters." (*People* v. *Pesky*, 230 App. Div. 200; affd., 254 N. Y. 373.)

In *People* v. *Muller* (*supra*) the court refused to allow expert testimony to influence a jury in determining the tenuous line between art and pornography. Later, in *St. Hubert Guild* v. *Quinn* (64 Misc. 336), the court itself indulges in an examination of critical opinions, holding that a contract for the sale of Voltaire's works, including the " Philosophical Dictionary " and the " Maid of Orleans " was not unenforcible because of alleged illegality under section 1141 of the Penal Law. In *Halsey* v. *New York Society* (*supra*) the conflicting opinions arrayed critical authority on either side. In a fairly recent case a court considered a large number of testimonials from people eminent in the literary life of this city and county, holding that this group of people, collectively, has a better capacity to judge of the value of a literary production than one who is more apt to search for obscene passages in a book

than to regard the book as a whole. (*People* v. *Viking Press, Inc.*, 147 Misc. 813.)

In *Matter of Worthington Co.* (*supra*), allowing the sale of Payne's edition of the " Arabian Nights," Fielding's " Tom Jones," Rabelais' works, Ovid's " Art of Love," " The Decameron," " The Heptameron," etc., etc., the court was influenced in its decision by the fact that they were rare and costly books and would not be bought or appreciated by the class of people from whom unclean publications ought to be withheld.

Recently, a court sought an escape from this apparent confusion and inconsistency and held that the statute is limited to works of pornography (*People* v. *Viking Press, supra*). This offers no real solution. It is the substitution of one term for another. " Pornographic " is defined in Funk & Wagnalls' " New Standard Dictionary " as " of or pertaining to obscene literature; obscene; licentious." The twilight zone between obscenity and pornography is, therefore, beyond human vision.

With so many books being written yearly by well-known authors, others not too well known and by would-be authors, a judge-made list of what people should or should not read might not be unwelcome to some persons. However, I, for one, repudiate such an obligation. Book lists, if they are to be prepared, I leave to other and more competent persons. Books, like friends, must be chosen by the readers themselves. We must pick and choose our friends in the book world just as we do in the real world, not looking for perfection in books any more than we do in people. The material must be coextensive with reality, and comprise the ugly as well as the beautiful. It is no part of the duty of courts to exercise a censorship over literary productions, or to regulate manners or morals. There are undoubtedly many books intentionally exploiting smut which the public and literature might well do without. Such books the statute condemns and duty requires that they be suppressed. Filth must remain filth in all ages. (*People* v. *Berg*, 241 App. Div. 543.)

In *People* v. *Berg* (*supra*) the court was unanimous in holding a certain book obscene within the meaning of our statute. Because of the unanimity of opinion, an analysis of the opinion might be useful. The findings of the court may be divided as follows: (1) The book lacks literary merit; (2) it teaches no lesson and points no moral; (3) it describes no period of history and the people or characters of that time and their conduct and habits of life, such, for instance, as the " Elizabethan Age; " and no folklore or tales of primitive people in isolated regions; (4) the story is not possibly true or representative of any individual or

of any limited class; (5) it is obscene, lewd, lascivious and disgusting, and nothing more; and was so intended to be for purely mercenary purposes.

This decision, the decision in *United States* v. *One Book Entitled Ulysses* (*supra*) and the decision in *Halsey* v. *New York Society* (*supra*) suggest, I believe, suitable tests. Is the book dirt for dirt's sake? (*United States* v. *One Book Entitled Ulysses*, 5 Fed. Supp. 182, 184; affd., 72 F. [2d] 705.) Stated broadly the problem is reduced to determination of the following issue: Whether or not, recognizing the latitude afforded all works of literature and of art, and that tastes may differ, a reasonable, cautious and prudent man environed with the conditions of life as they exist today, and not in some past age, would be justified in believing that the book was obscene and lewd not in certain passages, but in its main purpose and construction and published for no useful purpose, but simply from a desire to cater to the lowest and most sensual part of human nature? In applying these tests, relevancy of the objectionable parts to the theme, the established reputation of the work in the estimation of approved critics, if the book is modern; and the verdict of the past, if it is ancient, are persuasive pieces of evidence. (*United States* v. *One Book Entitled Ulysses*, 72 F. [2d] 705, 708.)

Counsel for the defendant urge as factors to be considered by me that the book in question sells for five dollars and is part of a very limited edition. Such evidence is immaterial. I cannot say that a fifty-cent book is obscene; but that a five-dollar book or a "de-luxe" edition is respectable. Such a view gives rise to two contrary implications — *first*, that the rich and extravagant have a monopoly of good manners and morals, which is not true; or *second*, that the rich and extravagant had either already been corrupted or were not worth saving, which is also not true.

I have read the book in question carefully. It is, as I have already stated, an autobiography. The author is described in "The Columbia Encyclopedia" (1935) as "one of the most distinguished of contemporary novelists and a leader of French liberal thought." The London Royal Society of Literature, desiring a French member to replace Anatole France, unanimously elected Gide (André Gide, "His Life and Work," by Leon Pierre-Quint). Two of the other works of Gide are "The Counterfeiters" and "Strait is the Gate." Of the former one reviewer wrote: "The book is one to read and reread; it reveals a hundred new beauties each time, a deeper ironic humor, a more searching tenderness, a more beautiful finesse and tact." (*New York Evening Post*, Oct. 15, 1927.) Of the latter book another critic stated: "Strait is the Gate is deservedly the book which made André

Gide famous; it is one of the great classics of French fiction since the death of Flaubert." (*New Republic*, July 23, 1924.) Critical opinion on the book in question is divided. In the *Saturday Review of Literature*, January 4, 1936, Mr. Christopher Morely writes: "Except to special students of its rather intricate author, it is of a devastating and somnambulizing dulness. Those familiar with the author's previous work will value it as the autobiography of a French philosopher of puritan origin, revealing with tormented candor the intellectual and biological griefs of his youth."

Lewis Gannett, writing in the *New York Herald-Tribune* of October 23, 1935, pronounces Gide's autobiography to be "one of those documents of morbidity, which, like the Confessions of Rousseau, is likely to live and perplex and comfort men for generations."

A reviewer in the *New Republic* of January 22, 1936, makes this observation concerning the portion of the book upon which an attack has been made: "In reality, the amateurs of the scabrous will be disappointed, for Gide is never purer than in 'impurity.' What in another context might have been an obscene anecdote is, in Gide's simple narrative, a subordinate, though necessary, phase in an essentially spiritual adventure."

Autobiographies are written, I suppose, for many reasons: self-study, request of friends, for the subject's children or descendants, for amusement, no one else likely to do it or to do it so well, for no reason whatsoever. Gide writes his for a penance. "Put the case I am writing it for a penance" (p. 4).

Autobiography is a legitimate and an important field of literature. The autobiography of a well-known author or even of an obscure person is sometimes as interesting, illuminating and as revealing as the autobiography of a famous statesman.

"The value of any biography depends on its being true," said Samuel Johnson. Gide says: "But the whole object of my story is to be truthful" (p. 4). In another significant passage he writes (p. 28): "but this is no romance I am writing and I have determined not to flatter myself in these memoirs, either by adding anything agreeable or hiding anything painful." The book contains a few paragraphs dealing with isolated instances of inversion, which, taken by themselves, are undoubtedly vulgar and indecent. The author himself states they are ugly. They are, however, subordinate to, although forming an essential part of the main theme. The greater portion of the book, however, is devoted to a straightforward and sincere narrative of his early years. The book essentially is an interpretive autobiography. It explains why he acted and not so much how he acted. Gide does not extol

his temporary departure from virtue; he does not deride virtue. In a sense, the book is a piece of special pleading for pardon, in the nature of counsel's speech for clemency.

André Gide is considered a great author; he is, therefore, entitled to be heard. For the whole value of personal testimony lies in the quality of the witness.

There may be an evil side to many great lives; the vices of a vital nature must not be left out in any estimate of that nature's development. If we eliminate the pages complained of, we would have a distorted and untruthful picture of our subject. If Gide, in unveiling the darker corners of his life, is moved by sincerity, by the deep-rooted desire to appear as he really is, an entire creature, then it is as an entire creature we must study him omitting nothing. If, and this is not the case, Gide had made vice his major topic, dwelt in with enjoyment for dirt's sake alone, then he would forthwith pass out of our hands into those of the pathologist. We do not go to the sanitarium in quest of friendship.

The book is not obscene, lewd, lascivious or indecent within the meaning of our statute.

For the reasons above stated, I hold that there is not sufficient cause to hold the defendant for trial.

Complaint dismissed; defendant discharged.