ULTEM PUBLICATIONS, INC., Plaintiff, *v.* ARROW PUBLICATIONS, INC., and HARRY DONENFELD, Defendants.

Supreme Court, Special Term, New York County, March 18, 1938.

*Louis H. Solomon*, for the plaintiff.

*Weil, Gotshal & Manges* [*H. S. Manges* and *G. Kaslow* of counsel], for the defendants.

COTILLO, J.    When this case was tried the court was of the opinion that the only question involved was the alleged unfair competition of the defendant in publishing a magazine in simulation of that of the plaintiff both as to the name used and the set-up of the magazine itself.    Both litigants are publishers of magazines bearing a name the outstanding feature of which is the word " stocking."    Neither one caters to the stocking trade and neither one is recognized or considered by the trade to be a trade paper.    Upon reading the minutes of the trial and after an examination of the exhibits consisting of the magazines themselves, an entirely new atmosphere was thrown around the case.    A prudent caution required that this examination of the exhibits be made in my own room, and the examination compelled me to place the exhibits under lock and key in order to prevent them from falling into the hands of my young daughter. Why was this necessary?    Only a detailed description of the two magazines themselves can supply the reason.    Upon the trial copies of the plaintiff's magazine, *Silk Stocking Stories*, for the months of January, February, March, April, May, June and July were marked in evidence.    Each one of these issues bears on its cover the picture of a young and attractive woman in a state of dishabille, and permissible only in the sanctum of woman's boudoir.    Each picture features nakedness, particularly as to her lower limbs and the naked breasts.    The table of contents partly published on the cover concerns stories each of which relates only to sex matters and bear names of double meaning, such as the " Key to Cora," " Girl in Danger," " Promise Not to Love Me," and " Come and Get Me." The type of fiction is that which has no literary merit and could only appeal to the type of person described in *New Metropolitan Fiction, Inc.*, v. *Dell Pub. Co.* (19 F. [2d] 718).    Each of the stories is written around and concern sex.    The pictures in the body of the magazine are confined to pictures of girls clad with nothing but underwear and stockings, and make a featured display of their arms and breasts and thus there is an inordinate emphasis of these parts of the body.

But an examination of the magazines is necessary in view of the decision the court is here making.    The January issue of the *Silk Stocking Magazine* reveals a cover upon which there is the picture of a girl, the main feature of which consists of her posing with her legs showing her bare skin between her hips and her stockings, her cloth-

ing is of the scantiest and her breasts are exposed and emphasized. The cover also contains the names of three alleged pieces of fiction under the following names: " Promise — Not to Love Me," " The Key to Cora " and " Girl in Danger." The inside pages contain twenty-four pictures of girls in various stages of dishabille and posing in suggestive and lewd positions. The stories are suggestive of illicit love affairs and some contain outright suggestions of sexual affairs between unmarried persons. One in particular is the story called the " Louse." In this story the female character complains to her friend about the insult received at the hands of a man who after giving her a bedroom in his apartment did not attempt to enter the room, and to quote her own words: "You must be an awful fool, Isabelle. But if *you'd* been in that room instead of me you'd know exactly how I feel. I locked the door of course, but that — that louse, HE NEVER EVEN TRIED THE HANDLE." The last part of this sentence was printed in capital letters. In the story, " The Key to Cora," the theme is about a young girl passing the night in her bedroom with an unmarried male, after a bet had been made as to her virtue. In " Promise Not to Love Me " the author uses as the basis of his story " the whirlwind, glorious temptations of youth had their way " through the excess use of alcohol. " Girl in Danger " is a description of petting parties. Under the title " Sheer Nonsense " the magazine prints jokes and sayings each having a double-edged meaning and salacious ideas, such as " We heard of an old maid who sued a hotel for mental cruelty. They gave her a room between two honeymooning couples." One of the two advertisements contained in this issue is that advertising Sex Harmony and Eugenics, with such statements as to " know the amazing truth about sex and love," " attract the opposite sex " and " The Forbidden Secrets of Sex are Daringly Revealed." Also set forth in this advertisement is " What Every Man Should Know," with the following subtitles, " The Sexual Embrace," " Secrets of the Honey-Moon," " Mistakes of Early Marriage," " Venereal Diseases," " How to Regain Virility," " Sexual Starvation," " Glands and Sex Instincts," " The Truth About Abuse," also " What Every Woman Should Know," with these subtitles, " Joys of Perfect Mating," " What to Allow a Lover to Do," " Intimate Feminine Hygiene," " Birth Control Chart," " How to Attract and Hold Men," " Sexual Slavery of Women " and " Sex Organs." The other issues contain the same kind of filth and have the same set-up as to stories and pictures. In the April issue of the magazine the publishers set forth their policy as follows: " Statement of Policy " — " The Editors know what happens to a girl who wears cotton stockings — Nothing."

The make-up of the defendant's magazine differs from that of the plaintiff practically only in the matter of title. The front cover and the pictures in the magazine itself contain the same type of undressed women in suggestive poses. The stories have the same general theme of sex and sex relations. They contain the same type of double-meaning jokes and wisecracks. The pictures in both magazines are for the purpose of merely appealing to neurotic and moronic minds minus even the doubtful virtue of being exotic. The defendant's issue carries the same advertisement for "Eugenics and Sex Harmony" as that of the plaintiff's magazine, including the topics mentioned above. The defendant differs in one respect from the plaintiff inasmuch as it carried a serial, each issue of the magazines containing the stories of adventures sought by a wealthy young man in his endeavors to find out what makes "Girls tick." His adventures consist of drinking to excess and indulging in moments of passion participated in by women, all of whom are either criminals or sex crazy.

The November issue, a typical example of defendant's magazine, carries an advertisement of what is commonly termed exotic literature. The advertisement is entitled twelve dollars worth of thrills for ninety-eight cents and offers such gems of degenerate literature as "Broadway Racketeers." This book is described in the advertisement as describing the "lusts of the racket mob." Among the other books described are "Replenishing Jessica," a book concerned only with the multitudinous sex adventures of the heroine. "The Time of Her Life," a description of the adventures of a girl who inherited the mad love of pleasure from her mother, the "Grass Widow." Another disgusting book advertised in this issue is "Playthings of Desire," a story of passion. The very titles of the stories published in the defendant's magazine are suggestive and moronic, such as "Fresh Guy," "What Makes Girls Tick," "Sexes & Sevens," "Karen Becomes Exotic" and "Country Slicker."

If justification is sought for the court's relatively great detailed description of the photographs described in the magazines of both litigants, it lies in the obvious answer that pictorial effects, especially such as those in the exhibits before me, can create much greater and more lasting harm on the impressionistic than may be truthfully charged against the most lurid, morbid or exaggerated descriptions of sex crime which the public has at times charged against our more popular newspapers.

The People of the State of New York, recognizing the difference between art, science and smut, have enacted proper legislation to prevent the sale and distribution of magazines such as those offered

by the parties to this litigation. The purpose of this legislation is to prevent the publication, distribution and sale of lascivious or obscene prints and publications, the tendency of which is to excite lustful desire. This purpose has been ably sustained by our courts and although the great majority of judicial decisions is confined to criminal prosecution, the court is of the opinion that when such publications are called to the attention of a court of equity the court should not shut its eyes to the facts.

That legislation affording public protection is found in section 1141 of the Penal Law. The purpose of that very section, as aptly stated in *People [Complaint of Sumner]* v. *Miller* (155 Misc. 446) was to suppress not *bona fide* literary effort, but the exploitation of smut. In *People* v. *Berg* (241 App. Div. 543) the Appellate Division of the Second Department affirmed a conviction for having in his (defendant's) possession an obscene and lewd book. In its opinion it held that to " be deemed obscene " it must show " sexual impurity " and result in " the exciting of lustful and lecherous thoughts and desires " or " tend " to stir sex impulses or " lead to sexual impure thoughts." The opinion further stated, in refusing to name the book in question, " In addition it lacks literary merit. It teaches no lesson and points no moral. It describes no period of history and the people or characters of that time and their conduct and habits of life. * * * In our opinion it is obscene, lewd, lascivious and disgusting and nothing more; and was intended to be for purely mercenary purposes." The magazines involved in this case fit definitely the book described in this opinion. They have no literary or artistic merit, either in their stories or pictures. As they are not trade magazines, they can have no purpose in their display of stockings and lingerie, except to appeal to that class of people described in *People* v. *Muller* (96 N. Y. 408), as " those whose minds are open to such immoral influences, and who might come into contact with it."

Presiding Justice MARTIN, of our Appellate Division, in writing the majority opinion in *People* v. *Pesky* (230 App. Div. 200; affd., 254 N. Y. 373) has to my mind properly and distinctly set forth (at p. 204), the test by which these matters must be determined. He wrote: " These matters must be judged by normal people and not by the abnormal. Conditions would be deplorable if abnormal people were permitted to regulate such matters. Of course there are some people who seem to be unable to find anything obscene in anything written. It is very clear that the author of the book now before us for consideration was not thinking of the spiritual, but devoted the whole book to the animal instincts of the human race. His efforts were not a lesson in morality, nor an attempt to uplift

the mind of the reader, but an attempt to depict, in a manner that might possibly be called clever, adulterous relations, vulgar and disgusting in the extreme."

The stories and photographs in the magazines of both plaintiff and defendant justify all that has been said in the quotation above from *People* v. *Pesky*.

We face a current drive today against sex perverts, all forms of vice engendered by loose morals, and even positive degeneracy. Some portions of the public press print with almost gruesome detail sex practices involved in crimes for which the accused frequently are convicted after trial, and for which crimes the condemned often expiate with their lives. These descriptions of sex crimes under the guise of " news " find avid readers among our youth, are even fed serially to their plastic minds, often being printed minus all condemnatory emphasis so that the youth and unsophisticated might well secure the feeling that such abuses are more widespread than they actually are.

Indeed, it would not be amiss to say that magazines of this character are actually more pernicious, definitely more harmful, than any newspaper which dares flagrantly to publish in untoward fashion, current stories of sex crimes.

In the case at bar we do not have a criminal charge, but that is not the criterion. Courts of equity have and maintain moral standards based on social needs and demands both. The youth of this city require more than mere negative protection, if incubus-like, the vices described above are not to spread.

I wish our youth to learn safety in avoidance, but not by paying the bitter price of experience. Only by protracted exposure to that kind of literature where conspicuously absent are all forms of salaciousness and lewdness, and which are beyond any taint or suspicion of immorality, can this social objective be obtained. This is the price which any community must pay to protect its youth and which a policy of eternal vigilance requires, demands and must exact. Only by such positive measures can we protect the minds of our growing boys and girls from this pestilence and noisome filth. These are not too strong words.

If, on the other hand, it appears that the publishing of these salacious stories and daring photographs are designed to stir up jaded sex appetites of those of advanced years, then again, such anti-social consequences warrant no aid from a court of equity, whether the case involved be one litigant against another, as here, or whether it be a case involving mutual incrimination. Surely to such persons as these others, advanced in years, court sermons are but vain whisperings lightly brushed aside.

Here we have the pot calling the kettle black, and equity will furnish no aid in the furtherance of purposes unsound socially as well as tainted by depressed moral levels.

One is no prude who fails to find in the magazines here submitted any compliance with the social standards required in our literature of today. A reading of the details relating to the stories and photographs set forth in the early part of this opinion compels the only possible decision which can be made here.

Granted that there be simulation both as to name and as to the extent that the key word " stocking " current with both magazines, is used; that a legitimate doubt is raised as to which identity is involved, the fact remains that the same degree of licentiousness is involved in the stories and photographs of both litigants. The significant thing here is that the salient objectives which these approximate similarities are designed to promote lack distinguishing earmarks.

Granted also, that the same run of advertising, size of paper, kind of jokes used — that these all display such likeness as to establish the trespass here alleged, still no proof has been submitted that the conscience of this court of equity has been moved so as to require that it be employed on behalf of one as against the other.

This court cannot be unmindful that its decrees enjoining one, by negative implication, give a clean bill of health to the other left free. Such left-handed justice would not do true equity under all the circumstances here.

In fact, it is indubitably established in my mind that, regardless of which position either of these litigants occupied in this litigation, only a calloused equity, hindered and fettered by subservience to legal rule (which it is not) could extend its arm and grant the aid sought.

In the case at bar the litigants both protest their literary and moral sufficiency. It is sought in this litigation to secure and have made available the high privileges found within the broad reach of the arm of equity. By the same token each must be prepared to stand to forfeit penalties, if any, such as that same court may see fit to impose.

The court has no power to stop the publication of magazines of this type in a civil proceeding, but neither will it lend itself to granting to one the sole right to publish such filth. Nor will it grant either magazine a cloak of respectability by issuing an injunction. These magazines can have no useful place in the world of literature and the very selection of the names is indicative of the fact that the publishers' sole desire is a financial return for the dumping of obscene and filthy publications at a cheap price where the young, immature and impressionable people can buy.

Others besides this court cannot but be impressed by recent figures quoted in the public press showing that for the seven years from 1929 to 1935, inclusive, sex offense cases averaged 897. In 1936 the increase over this average rose 40 per cent; in 1937 it is jumped to 110 per cent. In sex offenses other than rape, in 1936 alone, the increase over the seven-year period was 84 per cent; and in 1937, figures taken from the New York *Times* cite a 307 per cent rise.

Obviously, no specific part of such increase can be, nor is it attributed to the existence of these magazines. Yet the trend behind the above figures might well reflect a rise synchronizing with the increased subscription to magazines such as these are. To reverse this trend means to minimize the influence of both these magazines.

In the interest of common decency and under the powers of the equity side of court, the prayer for an injunction will be denied.

Settle proposed findings of fact.