THE PEOPLE OF THE STATE OF NEW YORK, Plaintiff, *v.* VANGUARD PRESS, INC., Defendant.

City Magistrate's Court of New York, Borough of Manhattan, Mid-Manhattan Court, May 12, 1947.

*Arthur E. Farmer* for defendant.

*John S. Sumner* for Harry Kahan, complainant.

STRONG, M. Although this proceeding is merely a hearing on the misdemeanor charge of violating section 1141 of the Penal Law by the sale of a book entitled, "End As A Man," published by the defendant, the question as to whether it is "obscene, lewd, lascivious, filthy, indecent or disgusting" within the meaning of that section must be determined by the magistrate substantially as though the proceeding were an actual trial of the charge. The same standards should be applied and, if the magistrate finds that the book fails to meet the prevailing judicial tests for such a characterization, by even a narrow margin, he must dismiss the charge.

"End As A Man" is the first published novel by a young man named Calder Willingham. Its scene is laid in a southern military academy whose graduates receive commissions in the regular army, and its characters are mainly students at the academy.

According to the testimony of the author, who attended the academy for a little over a full academic year, his purposes in writing the book was "to show some of the spiritual and emotional consequences on the youths attending such a school," and more specifically, to show what he described as the demoralizing effects of the severe hazing and strict discipline at the academy. He further testified that he hoped the realistic portrayal of these conditions in his book would be of value to the public by calling "attention to the degrading processes" involved.

Qualified literary critics testified that the book impressed them as sincere in purpose and an able piece of literary work. It may be arguable whether the students portrayed in the book acquired their more vicious and unpleasant characteristics as a result of their experiences at the academy or whether they already possessed them on arrival. But whether or not the author has proved a case (which he makes no claim to have

done), I find nothing in the book to indicate a lack of sincerity in his purpose. I am satisfied that every passage in the book was included because the author felt it was an element necessary to the truth of his literary picture.

Sincerity of purpose and literary worth are not, of course, conclusive on the question of obscenity. They are, however, factors to be borne in mind when applying the standards by which that question must be determined. (*Halsey* v. *New York Society for Suppression of Vice*, 234 N. Y. 1 [1922]; *People* v. *Berg*, 241 App. Div. 543 [1934]; *United States* v. *One Book Entitled Ulysses*, 5 F. Supp. 182, affd. 72 F. 2d 705 [1934].)

By the most tolerant standard, much of the dialogue between the characters in this book is unquestionably foul. It is liberally sprinkled with so-called four-letter words, for the most part used as adjectives or expletives. The author testified he would have been "dishonest" not to have included them as part of his portrayal. The speech of the characters must be considered in relation to its setting and the theme of the story. It seems clear that use of foul language will not of itself bring a novel or play within the condemnation of the statute. (*People* v. *Wendling*, 258 N. Y. 451 [1932]; *People* v. *Viking Press*, 147 Misc. 813 [1933].) The broad statement made by the court in the earlier case of *People* v. *Seltzer* (122 Misc. 329, 335–336 [1924]), that it is "offensive to the section if the matters charged as obscene are so filthy and disgusting as to be revolting to those who may have occasion to read them" must be regarded as dictum much limited by later decisions of appellate courts.

The test of whether a book comes within the condemnation of the statute depends not upon the choice of language used in it, nor upon the content of minor passages, but upon the effect of the whole book on reasonably normal readers both young and old. (*Halsey* v. *New York Society for Suppression of Vice*, supra; *People* v. *Pesky*, 230 App. Div. 200, 204 [1930]; *United States* v. *One Book Entitled Ulysses*, supra; *United States* v. *Levine*, 83 F. 2d 156, 158 [1936].) The standards to be applied have been variously defined but, it is now generally held, involve a measure limited to the extent to which that effect would be sexually demoralizing. (*People* v. *Winters*, 294 N. Y. 545 [1945].)

I have measured "End As A Man" by each of the prevailing standards, including whether it tends "to excite lustful and lecherous desire" (*People* v. *Eastman*, 188 N. Y. 478, 480

[1907]); whether it tends " to have the effect of stimulating sexual impulses " (*People* v. *Wendling, supra,* p. 453); whether it is " calculated to excite impure imaginations " (*People* v. *Muller, supra*); whether it is intended to be lewd for mercenary purposes or exploits smut (*People* v. *Gotham Book Mart, Inc.,* 158 Misc. 240 [1936]; *People* v. *Miller,* 155 Misc 446 [1935]); whether it tends " to lower the standards of right and wrong specifically as to the sexual relation " (*People* v. *Berg,. supra,.* pp. 544–545); and whether it contains " dirt for dirt's sake " (*United States* v. *One Book Entitled Ulysses, supra,* p. 184).

I do not find that this book comes within the terms of the statute by any of these standards. Its effect on the reasonably normal reader would not be sexually demoralizing. To borrow language from the court's opinion in *People* v. *Wendling* (*supra,* p. 454), it does not " invite to vice or voluptuousness ", its " scenes * * * repel rather than seduce," and, from the opinion in *United States* v. *One Book Entitled Ulysses* (*supra,* p. 185), its effect on the reader in many places is " somewhat emetic," but " nowhere does it tend to be an aphrodisiac."

The motion of the defendant to dismiss the complaint is granted.