THE PEOPLE OF THE STATE OF NEW YORK, Plaintiff, *v.* CREATIVE AGE PRESS, INC., Defendant.

City Magistrate's Court of New York, Borough of Manhattan, Lower Manhattan Court, May 19, 1948.

*John S. Sumner* for Harry Kahan, complainant.

*Harriet Pilpel* for defendant.

STRONG, M. The defendant is charged with having committed a misdemeanor under subdivision 1 of section 1141 of the Penal Law by reason of having sold a book entitled "The Gilded Hearse", published by the defendant, which the complainant

alleges to be " obscene, lewd, lascivious, filthy, indecent and disgusting."

At the hearing before this court the defendant's counsel offered as evidence a collection of letters claimed by it to be written by " prominent members of the community stating their opinions of The Gilded Hearse." These persons had concededly been solicited by the defendant to write these letters for use in this proceeding. I reserved decision on the objection by complainant's counsel to the reception of these letters in evidence. I had previously received, over counsel's objection, a collection prepared by defendant of clippings established to have been taken from a considerable number of newspapers and periodicals of general circulation containing reviews of " The Gilded Hearse " by literary critics for those publications.

The practice of referring to such reviews in cases of this nature has become well established. (*Halsey* v. *N. Y. Society for Suppression of Vice*, 234 N. Y. 1, 4; also see *United States* v. *One Book Entitled Ulysses*, 72 F. 2d 705, 708; *People* (*Savery*) v. *Gotham Book Mart, Inc.*, 158 Misc. 240, 244.) Opinions of professional critics publicly disseminated in the ordinary course of their employment are proper aids to the court in weighing the author's sincerity of purpose and the literary worth of his effort. These are factors which, while not determining whether a book is obscene, are to be considered in deciding that question. (See *People* v. *Berg*, 241 App. Div. 543, 544.) Such expressions of opinion can be of aid to the court only to the extent that it determines it may rely on them as disinterested and well-founded.

Even assuming their authenticity be conceded, it would seem to be a dangerous practice for courts in cases of this type to accept as aids a collection of letters such as that offered here. No opportunity is afforded to test the qualifications of the writers or their position in the community or to ascertain the nature of the persuasion employed in obtaining their views. For such private, solicited opinions to be given any weight those expressing them should be subjected to the same scrutiny in court as are other witnesses. Without that the court is unable to measure the extent to which the opinions expressed in the proffered letters may properly be relied on as aids in its determination. The only precedent for receiving in evidence letters such as those offered here is found in the Magistrate's Court case of *People* v. *Viking Press* (147 Misc. 813). I am of the opinion that that precedent should not be followed and I sustain the objection of complainant's counsel to the reception in evidence of defendant's collection of solicited letters.

"The Gilded Hearse", the first published novel by Charles O. Gorham, relates to the events of one day in the domestic and business life of a young publicity director for a large book publishing house. The marital discord between him and his wife leads to an act of sexual infidelity on the part of each of them. Between these episodes is a portrayal of a business conducted with a total lack of ideals and integrity. The day depicted is that of the Munich Conference in September, 1938, as the reader is reminded from time to time by the insertion of portions of radio news broadcasts. The author testified that his primary purpose in writing the book was to express his conception that, at any given time, the condition of national morality is reflected by the then current condition of individual morality and that national policies of compromise at the expense of principle occur when it has become common practice for individual moral standards to be disregarded for the sake of material advantage.

While there was some diversity of opinion among the newspaper, periodical and radio critics, whose published or broadcast reviews were received in evidence, as to the success of the author's effort, they generally expressed themselves as impressed by his sincerity of purpose. There seems no reason to doubt that every passage in the book was included by the author for the purpose of establishing his professed theme. The lack of moral values exhibited by the characters is by no means limited to the sexual; on the contrary, more space is devoted to showing their lack of other moral qualities, such as a sense of ethics in dealing with their associates and the public.

Unquestionably the characters generally are a shoddy lot. How persons so emotionally immature, intellectually limited and morally bankrupt could achieve positions of responsibility in any field, particularly that of book publishing, is difficult to comprehend. Their language is coarse and vulgar. They make occasional references to sexual contacts that are sophomoric and nasty. These references are, however, wholly incidental and are not descriptive. They are minor phrases and sentences serving in aid of characterization. Such incidental language does not of itself bring a literary work within the terms of the statute. (*Halsey* v. *N. Y. Society for Suppression of Vice*, 234 N. Y. 1, *supra; People* v. *Wendling*, 258 N. Y. 451; *People* v. *Viking Press*, 147 Misc. 813, *supra*.)

To determine whether a book falls within the condemnation of the statute, an evaluation must be made of the extent to which the book as a whole would have a demoralizing effect on its readers,

specifically respecting sexual behavior. (See *People* v. *Berg,* 241 App. Div. 543, *supra.*) Various factors should be borne in mind when applying the judicially accepted standards used in measuring that effect. Among others, these factors include the theme of the book, the degree of sincerity of purpose evident in it, its literary worth, the channels used in its distribution, contemporary attitudes toward the literary treatment of sexual behavior and the types of readers (particularly with respect to age and intellectual development) reasonably to be expected to secure it for perusal.

Giving due consideration to these various factors, I cannot find by any prevailing judicial standard that " The Gilded Hearse " would have a sexually demoralizing effect upon its readers. The two passages in the book of any substantial length which are concerned with sexual relations — the adulterous acts of intercourse by the husband and wife — contain little anatomical detail and refer to only momentary physical pleasure. In both cases these acts are immediately followed by feelings of shame and guilt. Neither husband nor wife derives any satisfaction from their infidelity and in the end they find they have only each other to cling to. One of the chief character's business associates is obviously homosexual but no direct reference is made to his sexual contacts. Nowhere does the book " invite to vice or voluptuousness " (*People* v. *Wendling,* 258 N. Y. 451, 454, *supra*), nor would it tend " to excite lustful and lecherous desires " (*People* v. *Eastman,* 188 N. Y. 478, 480). I find that this book is not obscene or otherwise within the condemnation of the statute.

In view of my finding, it is unnecessary to discuss the argument of defendant's counsel that a conviction in this case " would render the statute (subdivision 1 of Section 1141) violative of the Fourteenth Amendment to the Constitution of the United States and Article I, Section 8 of the Constitution of the State of New York." I shall only note here that in its recent decision in *Winters* v. *New York* (333 U. S. 507), holding subdivision 2 of section 1141 unconstitutional for vagueness, the United States Supreme Court in effect upheld the validity of subdivision 1, indicating that it has sufficient certainty through the use of " apt " words " well understood through long use in the criminal law."

Defendant's motion to dismiss the summons is granted and the defendant is discharged.