25 N.J. Super. 292 (1953)
96 A.2d 47
BANTAM BOOKS, INC., PLAINTIFF,
v.
MATTHEW F. MELKO, PROSECUTOR OF THE PLEAS OF THE COUNTY OF MIDDLESEX IN THE STATE OF NEW JERSEY, DEFENDANT.
Superior Court of New Jersey, Chancery Division.
Decided March 31, 1953.
Mr. Joseph Steiner, attorney for the plaintiff.
Mr. Stephen V.R. Strong, attorney for the defendant.
*293 GOLDMANN, J.S.C.
This injunction action results from the defendant's promulgation of a list of publications found "objectionable" by a citizens' committee. The proceedings center upon the committee's ban of The Chinese Room, a novel by Vivian Connell, but involved here is the larger question of extra-legal censorship.
Plaintiff, a New York corporation, has for some years been engaged in the business of publishing and selling paper-bound 25- and 35-cent reprints of books. Among them is The Chinese Room, first published by the Dial Press in 1942 and reprinted by plaintiff in 1948 at 25 cents a copy, pursuant to an arrangement with the original publisher. There were ten additional printings of the paper-bound edition before this action was instituted in February 1951. More than 2,500,000 copies of the novel have been sold throughout the United States and Canada.
Plaintiff distributes its books through circulation companies, among them the Curtis Circulation Company of Philadelphia which supplies the New Brunswick News Dealers Supply Company, of New Brunswick, N.J., and the Union County News Dealers Supply Company, of Elizabeth, N.J. Both serve Middlesex County and distribute plaintiff's reprints to newspaper stands, stores and other outlets in that area.
Some time before May 1950 the defendant Melko, then Prosecutor of the Pleas of Middlesex County, formed or accepted the services of a so-called Committee on Objectionable Literature, composed of citizens of the county. The purpose of the committee was to review publications offered for sale in Middlesex County, in order, as it is alleged, to determine whether they were fit and suitable reading for the public.
Defendant assigned Detective Bucko of his staff to work with the committee. He would visit stores and newspaper stands throughout the area, particularly those near schools, inform the owner of the state-wide drive against obscene literature, and ascertain what publications were in heavy demand, especially among young people. He would then *294 select copies for the temporary use of the committee  these apparently were later returned, except for those found objectionable. Each member received for review an equal share of the books and magazines garnered by Bucko, and eventually would report to the full committee which of them were objectionable and which unobjectionable. Defendant then prepared his list of objectionable publications on the basis of the committee's recommendation.
On May 5, 1950 defendant wrote the New Brunswick News Dealers Supply Company, copy to the Attorney-General of the State, as follows:
"Pursuant to the policy which I understand has been adopted by distributors of magazines and books to withdraw from circulation such literature as is found objectionable by the County Prosecutor and a committee appointed for that purpose, I am submitting herewith a list of all such publications which have been examined by the Middlesex County Committee and have been found to be of such nature that they should be withdrawn from circulation.
Will you please acknowledge receipt of this communication and advise me what steps you will take in the matter?
 Very truly yours,
 Matthew F. Melko,
 Prosecutor of the Pleas of
 Middlesex County."
(In passing, it may be observed that there is no proof of a "policy" adopted by the distributors, such as is referred to in the letter.)
The list mentioned in the letter contained 36 titles, of which 20 were distributed by the New Brunswick company. Five of the 36 titles were reprints published by the plaintiff.
The company manager, Ben Gelfand, acknowledged receipt of the above letter on May 9, stating "we shall do everything possible to cooperate with your wishes." Gelfand testified that he regarded the letter as a mandate to remove the books; his company did not want to get into trouble with the prosecutor's office or invite bad publicity. The New Brunswick News Dealers Supply Company immediately withdrew the objectionable publications, including The Chinese Room, from all retail outlets serviced by it.
*295 Gelfand sent a copy of the prosecutor's letter to Edward Koch, manager of the Union County News Dealers Supply Company in Elizabeth. Koch then wrote the defendant:
"We have been informed that your office has issued a list of publications that you have found objectionable and which you have banned from the newsstands in Middlesex County.
As we distribute magazines and allied publications in sections of Middlesex County, we ask that we be furnished with this and any subsequent lists."
Defendant replied immediately on May 10, 1952:
"In response to your request we are attaching hereto a list of objectionable literature to be withdrawn from circulation.
We appreciate your sincere cooperation."
The list was the same as that which accompanied the May 5 letter to the New Brunswick company.
Koch testified that his company, too, withdrew all copies of publications distributed by it which were on the list. He interpreted the "cooperation" mentioned at the close of the prosecutor's letter as an order to take the books out of circulation; if not, the company would be prosecuted. Koch, like Gelfand, testified there had been many requests for The Chinese Room, but that no copies were supplied to retailers after May 10.
Upon learning of what had happened, plaintiff requested defendant to have the citizens committee again review five of the listed books. This was done, for on July 25, 1950, Prosecutor Melko wrote to plaintiff's then attorney, stating that the committee was of the opinion that four of the titles
"should not be included on the list of objectionable books. The committee feels that the fifth book, `The Chinese Room' is properly listed as being objectionable and recommends its being kept on the list."
There were further conferences at which The Chinese Room was discussed. The results, insofar as plaintiff was *296 concerned, were negative. On November 28, 1950, defendant wrote plaintiff's present attorney as follows:
"Dear Mr. Steiner:
I am compelled to agree with Mr. Charles A. Pascal, Chairman of the Middlesex County Committee on Objectionable Literature, that the above named book is one that should not be exposed for sale where it can be purchased by school children.
I feel that the Committee is justified in requesting the distributors not to forward copies of this book to Middlesex County.
 Very truly yours,
 Matthew F. Melko
 Middlesex County Prosecutor"
The complaint charges that the defendant's action in not allowing The Chinese Room to come into Middlesex County is "invalid and illegal and beyond the scope of his office and that there is no legislative authority or any statute of the State of New Jersey under which the defendant could have acted where no crime has been committed or charged." Further, plaintiff alleges that "the pretended authority of the defendant in calling into action the committee above referred to, accepting its recommendations and acting upon them and instructing distributors not to bring the book into the County of Middlesex for sale and distribution, is not only illegal and void but has resulted and will result in irreparable injury to the plaintiff."
Plaintiff demands judgment that: (1) the May 10, 1950 letter of instruction to the Union County News Dealers Supply Company, and any similar letters to distributors, be declared void and of no effect; (2) the defendant be ordered to notify the Union County company, or any other distributor to whom he may have written, that his instructions are illegal and of no effect; (3) the citizens committee has no right to use the method it has been employing to prevent publishers and distributors from offering books for sale; (4) The Chinese Room may be distributed and sold in Middlesex County, without interference by the prosecutor's office; (5) defendant's letters and instructions constitute an extra-legal means for preventing the circulation of The *297 Chinese Room, and have resulted and will result in irreparable injury to plaintiff's business; and finally, (6) defendant's action in using his office to send letters to distributors telling them not to distribute and sell The Chinese Room in Middlesex County is an unlawful exercise of the powers of his office.
Defendant's answer denies the significant allegations of the complaint and sets up two separate defenses: (1) a denial that compulsion or threats were used at any time upon anyone having to do with the publication and sale of The Chinese Room, and (2) the book is "obscene and indecent and contains words indecent and lascivious in context within the meaning of R.S. 2:140-2 and R.S. 2:140-3," so that plaintiff comes into court with unclean hands.
The present Prosecutor of Middlesex County, Alex Eber, has been substituted in the place and stead of the original defendant.
The issues as molded by the pretrial order were: (1) Does the defendant prosecutor have the authority to ban the sale of books in his county as lewd and lascivious by order or letter issued by him; (2) does he have such authority as to the sale of The Chinese Room; (3) did he in fact issue an order banning the sale of The Chinese Room in Middlesex County; (4) were the letters signed by him in effect a ban on the sale of that book; (5) should an injunction issue restraining the prosecutor from further notifying distributors of the book that it should not be sold in Middlesex County; (6) should a mandatory injunction issue directing the prosecutor to recall the letters he issued; and (7) was his action in issuing the letters illegal and beyond the scope of his authority?
Defendant prosecutor argues that his letters cannot be construed as an order banning the sale of The Chinese Room in his county, or that they were in fact a ban on such sale. The contention is naive. His letter of May 5, 1950, for example, was taken by the distributors as a plain mandate to remove the books listed as "objectionable." And the May 10 letter to Koch, voicing "appreciation" for his "cooperation," was interpreted as an order to take the books *298 out of circulation under threat of prosecution. True, as the prosecutor says by way of defense, there was no actual compulsion or threat in words, but such was the very real impact and effect of his letters. They were enough to bring about the result he and his committee desired. They did what they were intended to do. The distributors were quick to obey, for they had plenty of other books to sell and were anxious lest the pattern of Middlesex County's action spread to other counties and markets. The plain fact of the matter is that not a single copy of The Chinese Room was sold in Middlesex County after the prosecutor's letters were received.
It is next argued that the court of equity will not interfere with the enforcement of criminal law. Dell Publishing Co. v. Beggans, 110 N.J. Eq. 72 (Ch. 1932), is the only case cited in support of the proposition. The argument is vulnerable in two respects: as stated it is too broad, and further, the application here is not to enjoin criminal proceedings but to enjoin the prosecutor, acting under color of authority, from violating property rights claimed by plaintiffs. Brex v. Smith, 104 N.J. Eq. 386 (Ch. 1929); Ruty v. Huelsenbeck, 109 N.J. Eq. 273 (Ch. 1931).
The language of Vice Chancellor Berry in S. & R. Amusement Corp. v. Quinn, 136 N.J. Eq. 420, 423-424 (Ch. 1944) is appropriate:
"While ordinarily equity will not enjoin criminal prosecutions, there is an exception to the rule where property rights are involved, and it is claimed seriously and in good faith that the act of the prosecutor is not authorized by law. * * * Here, however, no criminal prosecution is pending, nor has any restraint against the due processes of the law been imposed or sought. It will not be presumed that the complainant in the conduct of his business is guilty of a crime. The presumption is to the contrary.
* * * there is ample judicial authority in this state for the proposition that valuable property rights will be protected by injunction from damage or destruction, threatened or resulting, from the arbitrary acts of officials acting without due process of law." [citing cases]
The question of whether equity has power to enjoin the arbitrary action of municipal officials in interfering with *299 persons in the conduct of their business was considered by Vice-Chancellor (now Judge) Haneman in Higgins v. Krogman, 140 N.J. Eq. 518 (Ch. 1947). He said (at pages 520-521):
"The power of the Court of Chancery to restrain illegal interference with legitimate business by peace officers under the guise of enforcing the law is indisputable. See Iannella v. Piscataway Township, 138 N.J. Eq. 598; 49 A.2d 491. Cases in which this question has arisen are generally concerned with an alleged violation of the criminal law and an attempt to prevent such violation by methods other than those which might be classed as due process. An examination of these cases discloses that although the Court of Chancery will ordinarily not interfere with the enforcement of the criminal law of this state, this court will enjoin interference with the conduct of business by physical force upon the mere claim that offenses against the criminal law are being conducted during the operation of such business, particularly where the law-enforcing officers fail or refuse to properly arrest and charge the alleged violators in accordance with the established law. [citing many cases]
There is ample authority for the proposition that valuable property rights will be protected by injunction from damage or destruction, threatened or resulting, from the arbitrary acts of officials acting without due process of law.
As was stated in Ruty v. Huelsenbeck, supra:
`It would be intolerable if the operation of any business might be interfered with because some police officer came to the conclusion that the business was being operated in violation of the law. Such a condition would result in a government of men, not of law.'"
It may be argued there was no physical force in the case at bar. But the display of force which courts enjoin is not limited to the use of physical strength. Defendant's letters had the threat of the law behind them; they were terse in their insistment and demonstrably effective.
The Higgins case was affirmed on appeal, 142 N.J. Eq. 691 (E. & A. 1948). Justice Jacobs, writing for the court, said (at page 693):
"* * * In so far as his [the vice-chancellor's] restraining order was confined to a restraint of the described extra-legal activities, it was clearly, under the undisputed facts and circumstances, a proper exercise of the Court of Chancery's jurisdiction to protect complainants' property from irreparable injury threatened by `arbitrary acts of officials acting without due process of law.'"
*300 The case of Public Welfare Pictures Corp. v. Brennan, 100 N.J. Eq. 132 (Ch. 1926), is pertinent. Complainants owned a film called The Naked Truth and contracted to exhibit it at a Newark theatre. A private viewing was held before the first public exhibition, attended by the chief of the Board of Health of Newark, two members of the local police department, known as the board of censors and appointed by defendant Brennan, Director of Public Safety of Newark, and also by a number of ladies invited by the board of censors and Brennan. The board of health representative saw nothing objectionable in the film; the board of censors did. Brennan then caused notice to be given complainants that presentation of the film was prohibited, that he would prevent the production by force, revoke the theatre license and arrest all persons connected with the exhibition. The complainants offered to exhibit the film to him personally and not produce it if he deemed it objectionable. He refused the offer, stating that he would stand behind the judgment of his board of censors. Complainants thereupon applied for an injunction restraining him and the City of Newark from interfering with the production, alleging monetary loss if they were not allowed to exhibit the film. In granting the injunction the court referred to four cases where similar action was taken, one by former Chancellor Walker and three by former Vice-Chancellor Howell, the latter being quoted as follows (100 N.J. Eq., at page 136):
"* * * `I know of no power in our police department to censor plays or theatrical exhibitions. None was cited on the argument, and I take it that, therefore, none exists. I, therefore, cannot see where the police authorities get their right to meddle in such matters.' * * *"
Clearly, important property rights are involved here, and they have been seriously affected by the prosecutor's action. Plaintiff is one of the largest, if not the largest, publisher and distributor of pocket-size reprints in the United States. A goodly number of the 2,500,000 copies of The Chinese Room sold by it undoubtedly went into the hands of New *301 Jersey purchasers. If what defendant has done in this case were held legal, his ban on the sale of this and other books considered by him objectionable would result in an irreparable injury to plaintiff and the loss of considerable profits, particularly when one realizes that hundreds of millions of 25-cent reprints are sold in this country annually.
It cannot be argued that the censorship exercised here was not that of the prosecutor, but rather of the Middlesex Committee on Objectionable Literature. The committee may have advised; the defendant acted. No statutory authority exists for what was done. The Legislature has not yet clothed the county prosecutors, or the Attorney-General, with the power to censor books, and so there is no occasion to consider the possible constitutionality of such legislation. But if the Legislature had, and defendant sought to excuse what was done by claiming that it was the act of the committee, then the answer would have to be that a delegated power cannot be delegated. Delegata potestas non potest delegari. Defendant, as the official entrusted with the diligent enforcement of the criminal law in his county, could not delegate to a voluntary committee of citizens such authority as he might claim, to say whether a certain book should or should not be distributed and sold.
I hold that neither the prosecutor nor the committee constituted by him had authority to proscribe the distribution or sale in Middlesex County of books deemed by them, or either of them, to be objectionable. The action of the prosecutor in issuing the letters reproduced above was illegal and beyond the scope of his official authority.
Defendant advances a second defense: that The Chinese Room is "obscene and indecent and contains words indecent and lascivious in context within the meaning of R.S. 2:140-2 and R.S. 2:140-3." We are not concerned, for the moment, with the meaning to be given the words "obscene," "indecent" and "lascivious." These words, incidentally, appear nowhere in defendant's letters, but undoubtedly are what he meant when he euphemistically described the banned books as "objectionable literature." The statutes he now mentions *302 for the first time as justification for his action make it a misdemeanor for any person (a) to utter or expose to the view of another, sell, or advertise or recommend any obscene or indecent book, pamphlet, picture or representation (R.S. 2:140-2); or (b) maliciously to set in type to be used in printing a newspaper, magazine or other current publication, or to change any piece of type, for the purpose of causing any indecent or lascivious word to appear in print in such publication (R.S. 2:140-3).
Defendant could have proceeded against plaintiff or any distributor in an orderly fashion under at least the first of the cited statutes. Had he done so there would then have been called into play the full range of criminal prosecution, from complaint and arrest, through indictment and trial by jury, with a verdict of guilty before any penalty could be invoked.
Also available against an offending distributor or seller was R.S. 2:178-6 which provides for search for and seizure of obscene and indecent books, papers, pictures, articles or things through the medium of the municipal court. Defendant did not avail himself of this in rem proceeding.
There are, then, several alternate and proper legal means at hand for dealing with allegedly obscene and indecent literature, none of which defendant used. The three statutes referred to give to law enforcement officials effective means of preserving and protecting the community morals, but none of them gives any such official the right to prejudge a situation and act upon it in the way defendant did in this case.
We have here a clear case of previous censorship in the area of literary obscenity. The way of the censor has been tortuous and tortured from earliest times. His story is one of arbitrary judgment and the suppression of much that we now consider good, true and beautiful. Ernst and Seagle, To the Pure ... A Study of Obscenity and the Censor (1928), passim. Even the most cursory account of literary censorship will show its contradictions, the absence of valid standards, its lack of inner logic and outward consistency.
*303 Little that is truly great in literature has escaped the censor's proscription. The Bible has fallen under his ban, Shakespeare was expurgated to satisfy his offended eye. Plutarch considered the Comedies of Aristophanes obscene, and Plato in his Republic recommended the expurgating of Homer lest it demoralize the minds of Greek youth. There was a burning of the books of Protagoras in the Agora in Athens, and Homer was similarly dealt with in Rome by Caligula. Generally, however, it may be said that suppression of books in the ancient world was rather limited. Literary censorship did not come into its own until the invention of printing in the middle of the 15th Century. As books became more common, the censor became more active. The focus of censorship has changed with the times, depending upon the overriding concerns of the era. The procession of censorship has been from heresy to treason to obscenity.
In the Age of Faith, with the Church supreme, the focus of suppression was upon heresy and blasphemy. For a long time the Church concerned itself little with obscenity as such and looked with some tolerance upon pagan and later writers and their alleged obscenities. Boccaccio may have been on the Index Librorum Prohibitorum, but the passages under ban were not those suppressed in modern times, but those reflecting upon religion and the Church. With the coming of the Reformation and the emergence of the State as the absolute power, the focus of suppression was upon treason and sedition. The censor was concerned more and more with literary proprieties in the political field. The absolute political state was not overly concerned with sex censorship. The censor's preoccupation with sexual morality (obscenity) began to develop only in the time of Queen Victoria, soon after the beginnings of the Industrial Revolution and the rise of technology. It has continued to our day.
The unpredictability and inconsistency of the censor is notorious. We need only consider the varying manner in which he has treated the several media of communication and art. The printed word has been the principal target. Drama has been considered a somewhat lesser problem, depending *304 upon the time and place. No less a person than Goethe wanted to keep the young out of the theatre and Voltaire, who wrote Candide, condemned Corneille's Theodora. Previous censorship of the stage was known in France until 1906; the Lord Chamberlain still passes final judgment on what is a proper play for Englishmen; and New York had the Wales Act (1927) and closed The God of Vengeance and The Captive. The motion picture screen has received a treatment all its own at the hands of state censorship boards and local self-declared censors, in addition to its own code of decency. By contrast, the tabloids, sensational newspapers and even the more staid publications have gone relatively unscathed in reporting sex crimes and perversions in detail. The Comstocks have paid unwelcome attention to sculpture and painting  witness the furore some time ago over Boston's fine Greek Bacchante and the calendar art of September Morn  while they have turned eye and ear away from the undeniably erotic compulsion of certain performances of music and the dance. To look for a common standard and purpose in censorship is to seek the impossible.
Our essential concern here is with the question of literary decency. One might expect a greater consistency and significance of purpose in the censor's treatment of books. However, one need make only casual inquiry to appreciate that it is impossible to evolve any pattern of consistent treatment of books considered obscene. As Ernst and Seagle point out in their chapter on "The Enigmas of Literary Decency," obscenity exhibits many aspects. There is the temporal aspect. Swinburne's Poems and Ballads had to be withdrawn in 1866 because of the public clamor; Walt Whitman's Leaves of Grass fell under Boston's ban in 1881 and was likewise withdrawn; Havelock Ellis' The Psychology of Sex was the censor's victim in 1898, as was Theodore Dreiser's The Genius in 1916. All are now openly and widely distributed and read. The classics occupy a special field of their own in the annals of literary obscenity. They are respected and untouched, enjoying what has been termed "a statute of limitations on obscenity." When Vizetelly was prosecuted in *305 England in 1888 for publishing Zola's novels, he sent the Solicitor of the Treasury a list showing that their suppression would logically involve the bowdlerization of some of the greatest works in English literature, among them Shakespeare, the Restoration dramatists, Defoe (Moll Flanders), Swift, Fielding, Smollett, Sterne (Tristam Shandy), and Lord Byron (Don Juan). The censors in the leading book markets of the English-speaking world, London, New York and Boston, have generally passed by the classics with little more than a troubled glance.
Obscenity also has a spatial aspect. For example, though Boston threatened criminal prosecution in the case of Leaves of Grass, England did nothing. D.H. Lawrence's The Rainbow was prosecuted in England, but not in America, as was Sherwood Anderson's Many Marriages. The New England Watch and Ward Society had well over 100 titles on its prohibited books list and actually instituted prosecutions involving novels by Sinclair Lewis, Upton Sinclair and Theodore Dreiser. The New York Society for the Suppression of Vice was less active and left the three authors alone. Its own index of prohibited books was in agreement with Boston's in only two instances.
There are still other variables that enter into the problem of literary obscenity. One is the question of language: Rabelais in French or Boccaccio in Italian are not objectionable, but they set vice societies in motion when printed in English. Cheap reprints of a book considered objectionable invite the censor's ban, where deluxe editions or so-called "privately printed" erotica, "issued to subscribers only," do not.
Nowhere is the inconsistency of literary censorship more patent than in the federal field. The Post Office Department has exercised censorship by indirection since Comstock obtained passage of the Postal Censorship Law in 1873, which provided that obscene literature could not be sent through the mails. In the exercise of the discretionary power lodged with them, federal postmasters have barred such varying publications as The Little Review, Hearst's Magazine, The *306 American Mercury, Life, Physical Culture, Ovid, and the report prepared by the Chicago Vice Commission in 1911 for circulation among editors, social workers and clergymen. In the meantime, the Public Health Service and the Office of Education in the Federal Security Agency issue government-printed publications dealing with the life process and sex education. Although the Copyright Office is directed by law to refuse copyright to obscene books, it has not been known to refuse copyright to any of the books barred from the mails or suppressed by local authorities where such books were printed in this country. The Department of the Treasury may, under the Tariff Act, refuse admission of obscene books to the United States through federal customs. The use of this authority has been absolutely unpredictable. For example, the New York Customs Office barred such books as James Joyce's Ulysses and Pierre Louys' Aphrodite, but gave free passage to Rabelais, The Decameron, The Arabian Nights and Ovid. All this points up the enigmatic nature of literary obscenity, the elusiveness, if not the total absence, of any ultimate, central and governing concept.
Defendant regards The Chinese Room as "obscene and indecent" and some of its words "indecent and lascivious," within the meaning of R.S. 2:140-2 and 3. This spatter of epithets distills out to nothing more than a single meaning  sexual impurity. Swearingen v. United States, 161 U.S. 446, 16 S.Ct. 562, 40 L.Ed. 765 (1896); United States v. "Ulysses," 72 F.2d 705 (C.C.A. 2 1934); Commonwealth v. Isenstadt, 318 Mass. 543, 62 N.E.2d 840 (Sup. Jud. Ct. 1945); People v. Wendling, 258 N.Y. 451, 180 N.E. 169, 81 A.L.R. 799 (Ct. App. 1932); Commonwealth v. Gordon, 66 Pa. Dist. & Co. 101 (Cty. Ct. 1948), affirmed 166 Pa. Super. 120, 70 A.2d 389 (Sup. Ct. 1950).
The problem is to discover, if possible, what "obscene" means. It has been suggested that the word comes from ob and scena  done off the scene or off-stage, and hence furtively. Webster's New International Dictionary (2d ed. 1943) gives the derivation as obs (ob) and caenum, filth, and then goes on to define "obscene" as:
*307 "Offensive to chastity of mind or to modesty; expressing or presenting to the mind or view something that delicacy, purity and decency forbid to be exposed; lewd; indecent; * * *."
2 Bouvier's Law Dictionary, Rawle's Third Revision, page 2396 (8th ed. 1914) gives the definition:
"Something which is offensive to chastity; something that is foul and filthy, and for that reason is offensive to a pure-minded person. * * * That which is offensive to chastity and modesty."
These and similar reference works provide no objective standard or formula for determining when obscenity exists. The definitions all lead to the dead-end of a subjective determination. To paraphrase Samuel Johnson, the yea or nay saying of the censor becomes the standard of the permissible.
The argument sometimes made that anyone can tell by instinct what is obscene and what is not led Judge Curtis Bok to say in his learned opinion in Commonwealth v. Gordon, above (66 Pa. Dist. & Co. at page 116) that "The idea that instinct can be resorted to as a process of moral stare decisis reduces to absurdity."
The statute, R.S. 2:140-2, does not define "obscene." It merely proscribes publications that are obscene, leaving it to the constituted authorities to decide whether they are or not.
It has been pointed out elsewhere that the meaning of terms fundamental in the law of property, of words like "murder," "arson" and "mayhem" in the law of crimes, and even of "negligence," have remained relatively constant. Not so with "obscenity" or "obscene," whose meaning has undergone many changes, particularly in recent decades. In seeking a broad and all-inclusive definition of "obscene," censor and judge alike are, to employ the language in Joseph Burstyn, Inc. v. Wilson, 343 U.S. 495, 72 S.Ct. 777, 96 L.Ed. 1098 (1952), "set adrift upon a boundless sea amid a myriad of conflicting currents * * *, with no charts but those provided by the most vocal and powerful * * *."
*308 Any consideration of the history of literary censorship will show that the term "obscene" does not gain "precision from the sense and experience of men" (Mutual Film Corp. v. Ohio Industrial Commission, 236 U.S. 230, 35 S.Ct. 387, 59 L.Ed. 552 (1915)). What was said by Justice Frankfurter in the Burstyn case of a certain definition applies here  the limits of the definition of "obscene" "remain too uncertain to justify constraining the creative efforts of the imagination by fear of pains and penalties imposed by a necessarily subjective censorship." His comment on the word "sacrilegious" involved in that case is a propos here:
"On the basis of such a portmanteau word * * * the judiciary has no standards with which to judge the validity of administrative action which necessarily involves, at least in large measure, subjective determinations."
No purpose is to be served by a detailed review of all the cases dealing with literary obscenity and with censorship. Some will be mentioned by way of background or as of contemporary interest. As one might expect, the decisions are most numerous in the federal jurisdiction, New York, Massachusetts and Pennsylvania. They are gathered and discussed in articles like Alpert's "Judicial Censorship of Obscene Literature," 52 Harv. L.R. 40 (1938), and Grant and Angoff's "Massachusetts and Censorship," 10 Boston Univ. L. Rev. 36, 147 (1930); and in Judge Bok's decision in Commonwealth v. Gordon, above.
The early common law did not treat obscene literature as a crime. The first case actually to establish literary obscenity as an offense was Regina v. Read, 11 Mod. 143 (K.B. 1708). Lord Holt held that writing an obscene book was not indictable; it was, however, punishable "in the spiritual court." But in Rex v. Curl, 2 Strange 789 (K.B. 1727), the court sustained the indictment brought against a bookseller specializing in the obscene, holding that the offense was triable in the common law courts. Blackstone had little more than this case to go on when he began his famous lectures in 1758. See 4 Commentaries, 150-151. Twelve years later *309 Lord Mansfield gave questionable judgment against the defendant in Rex v. Wilkes, 4 Burr. 2527 (K.B. 1770)  a politically inspired case  for printing a bawdy poem. Thus, when the 18th Century came to a close, the English Bar knew there was such a doctrine as indictable obscenity, a latecomer as common law doctrines go, but they knew little more. There was no definition of obscenity, no basis for identifying it.
The next half-century was relatively uneventful. The English Society for the Suppression of Vice was formed in 1802 and set itself up as censor of the pornographic. Lord Eldon assumed the role of literary critic-censor in condemning Poet Laureate Southey's revolutionary drama Wat Tyler, and Byron's poem Cain. Southey v. Sherwood, 2 Mer. 435 (Ch. 1817); Murray v. Benbow, Jac. 474n (Ch. 1822). In the latter case he went on to voice his doubts about Milton's Paradise Lost, which led Lord Campbell, a great lover of literature, to write:
"* * * it must have been a strange occupation for a judge who for many years has meddled with nothing more imaginative than an Act of Parliament, to determine in what sense the speculations of Adam, Eve, Cain, and Lucifer are to be understood. * * *" (7 Lives of the Lord Chancellors (3rd ed. 1850), 637)
Byron was twice-loser when Chancery thought his Don Juan obscene in Lord Byron v. Dugdale, 1 L.J. Ch. 239 (1823).
Lord Campbell's Act of 1857 (20 and 21 Vict.) marks the critical point in the history of literary obscenity. It provided for search and seizure warrants that would permit the police to take and destroy obscene publications. The bill drafted by Lord Campbell was intended as a protection for children against the many pornographic books, pamphlets and picture postcards then, as now, in circulation. His intentions may have been of the best (they have been questioned in some quarters; see Alpert, op. cit., 52 Harv. L. Rev., at 51-52), but the consequences were deplorable.
The debate on the bill is of great significance. Lord Campbell was asked in the House of Lords to define "obscene." He replied that
*310 "the measure was intended to apply exclusively to works written for the single purpose of corrupting the morals of youth, and of a nature calculated to shock the common feelings of decency in any well regulated mind. * * * He was ready to make what was indictable under the present law a test of obscenity." (Italics ours.) 146 Hansard, Parliamentary Debates (3rd ser. 1857), 327 et seq.)
The bill was attacked in the House of Commons as "preposterous" and as an attempt "to make people virtuous by Act of Parliament." By the close of the debate Lord Campbell had made it quite clear that any work which so much as pretended to be literature or art had little to fear. Only the truly pornographic would be criminal. Lord Brougham warned that once the bill became an act, Lord Campbell's intentions would be perverted. They were, and in little more than a decade.
Regina v. Hicklin, L.R. 3 Q.B. 360 (1868), concerned the sale of an anti-Papist pamphlet, The Confessional Unmasked. Copies were seized under Lord Campbell's Act. The court below had held that although the pamphlet was obscene in the ordinary meaning of the word, it had been distributed for the honest purpose of exposing the practices of the confessional and so did not come within the act. Whether the limitations which Lord Campbell had put upon the act were argued on the appeal, or known to the court, it spoke as though they had never existed. Lord Chief Justice Cockburn sympathized with the author's purpose but considered the book dangerous to growing sons and daughters. He announced a "test" for obscenity which provided three generations of judges with a ready formula:
"* * * whether the tendency of the matter charged as obscenity is to deprave and corrupt those whose minds are open to such immoral influences and into whose hands a publication of this sort may fall."
There have been many criticisms of the rule, direct and indirect, open and veiled, inside the courts and out. Recent cases reject the Hicklin doctrine completely. One of the more recent critiques appears in Commonwealth v. Gordon, 66 Pa. Dist. & Co. 101, 125:
*311 "Strictly applied, this rule renders any book unsafe, since a moron could pervert to some sexual fantasy to which his mind is open the listings in a seed catalogue. Not even the Bible would be exempt; Annie Besant once compiled a list of 150 passages in Scripture that might fairly be considered obscene * * *."
And the court points out that portions of many ancient and modern authors  esteemed and established in literature for all time  would also be offensive.
There have been only a handful of English cases on literary obscenity since Regina v. Hicklin, and they generally follow the rule it enunciated. The courts have been resorted to but little; the English community itself has judged whether the books that find their way into the market-place are inherently decent. For a while in the late 19th Century the private circulating libraries, and particularly Mudie's, exercised a wide and effective censorship on what the public might read. Ernst and Seagle, To the Pure, 85 et seq. It was the day of the three-volume novel, at 31s 6d. Both the monopoly and censorship of these libraries were broken with the appearance of novels in one-volume form at 6s  a development of sociological as well as economic importance whose implications are almost self-evident. There has since been only a minimum of suppression by the law or the self-constituted censor; each citizen is his own critic of what is "obscene," and the Hicklin rule, though not suited to the English temper, serves as a legal standby in case of real trouble.
The impact of Regina v. Hicklin was much greater in the United States than in England. It gave men like Anthony Comstock their opportunity. He fathered the Postal Censorship Law of 1873 and obtained or inspired passage of obscenity laws throughout the country. That same year he organized the New York Society for the Suppression of Vice under a special act which gave its agents the right of search, seizure and arrest  a strange departure from accepted methods in the administration of the criminal law. Shortly there was a similar society in the mid-West, and the New England Watch and Ward Society with headquarters in Boston. The *312 history of suppression in America is largely the history of the activities of these private censors. However sincerely motivated, they put literature in shackles. Their subjective judgment as to what were the vehicles of moral infection went for the most part unchallenged; the only check was the courts  strict in Massachusetts, more liberal in New York and in the federal system. The activities of these organizations under men like Comstock, Sumner and Chase, and of their local counterparts, indelibly underline the dangers of uncontrolled previous censorship.
Boston long enjoyed the doubtful reputation of being the center of book suppression. Massachusetts adopted Lord Cockburn's test in the Hicklin case in Commonwealth v. Buckley, 200 Mass. 346, 86 N.E. 910, 22 L.R.A., N.S., 225 (Sup. Jud. Ct. 1909), in holding Elinor Glyn's Three Weeks as obscene, indecent, impure and manifestly tending to corrupt the morals of youth. Dreiser's An American Tragedy was branded unfit in Commonwealth v. Friede, 271 Mass. 318, 171 N.E. 472, 69 A.L.R. 640 (Sup. Jud. Ct. 1930); the court refused to allow the complete book to be introduced in evidence, and the prosecuting attorney picked the selections he wanted. (At that time the Massachusetts statute forbade the sale of any book containing obscene and indecent language.) The defense pointed out that the obscenity test applied by the court reduced the most intelligent members of the community to the same level as the immature and lewd. D.H. Lawrence's Lady Chatterly's Lover suffered the same judgment as Glyn's Three Weeks in Commonwealth v. DeLacey, 271 Mass. 327, 171 N.E. 455 (Sup. Jud. Ct. 1930).
The wave of censorship which swept over Boston at this time resulted in the suppression of some 68 books. The law was changed to proscribe the sale of "a book which is obscene, indecent," etc. A more reasonable rule was the result. For example, though Commonwealth v. Isenstadt, 318 Mass. 543, 62 N.E.2d 840 (Sup. Jud. Ct. 1945), upheld the conviction for selling Strange Fruit, the court held that the book had to be considered as a whole and went so far as to *313 say that "Since effect is the test, it follows that a book is to be judged in the light of the customs and habits of thought of the time and place of the alleged offense." And in Attorney General v. "Forever Amber," 323 Mass. 302, 81 N.E.2d 663 (Sup. Jud. Ct. 1948), the court went even further by noting that the sincerity and historic purpose of the book are important elements in passing judgment.
Massachusetts now allows a proceeding to be brought against the book itself, instead of the seller or distributor, with interlocutory adjudication as to whether it is obscene  a variety of declaratory judgment passing upon a book in advance. Mass. Ann. Laws, 1945 Supp., c. 272, § 28, and see Note, 50 Harv. L.R. 813 (1946). See also Attorney-General v. "God's Little Acre," 326 Mass. 281, 93 N.E.2d 819 (Sup. Jud. Ct. 1950), and Attorney-General v. "Serenade," 326 Mass. 324, 94 N.E.2d 259 (Sup. Jud. Ct. 1950), wherein Massachusetts adopts the modern rule that a book is to be judged by its artistic merit and as a whole; its effect is to be judged by a person with average sex instincts and not by those members of the community who might be particularly susceptible. "It would be deplorable, indeed, if the literary fare of normal adults were reduced to the level of ten-year-olds or psychopaths."
The New York courts have kept fairly clear of the orthodox test of the Hicklin case, although it was applied to Schnitzler's Reigen in People v. Pesky, 230 App. Div. 200, 243 N.Y.S. 193 (App. Div. 1930), affirmed 254 N.Y. 373, 173 N.E. 227 (Ct. App. 1930). All but two cases arose under section 1141 of the Penal Law, passed in its original form in 1884 and prohibiting "any obscene, lewd, lascivious, filthy, indecent or disgusting book, magazine, pamphlet," etc. 39 McKinney's Consolidated Laws of New York, § 1141. These two were In re Worthington Co., 30 N.Y.S. 361, 24 L.R.A. 10 (Sup. Ct. 1894), allowing a receiver to sell the Arabian Nights, Decameron, Heptameron and similar classics held not obscene, and St. Hubert Guild v. Quinn, 64 Misc. 336, 118 N.Y.S. 582 (Sup. Ct. 1909), where the court in allowing the publisher to recover the contract price of certain *314 books challenged as immoral, said that "It is no part of the duty of the courts to exercise a censorship over literary productions."
The main development began with Halsey v. N.Y. Society for the Suppression of Vice, 234 N.Y. 1, 136 N.E. 219 (Ct. App. 1922), affirming 194 App. Div. 961, 185 N.Y.S. 931 (App. Div. 1922). Halsey had been arrested by defendant's agent for selling Gautier's Mme. de Maupin and acquitted. He sued the Society for malicious prosecution and recovered. The Court of Appeals affirmed, holding that the "book must be considered broadly as a whole." In discussing at some length the divided opinion of the literary critics as to the novel's merits, the court noted that such conflict
"points a finger at the dangers of a censorship entrusted to men of one profession, of like education and of similar surroundings. Far better than we, is a jury drawn from those of varied experiences, engaged in various occupations, in close touch with the currents of public feelings, fitted to say whether the defendant had reasonable ground to believe that a book such as this was obscene or indecent."
The modern view was expressed in People v. Wendling, 258 N.Y. 451, 180 N.E. 169, 81 A.L.R. 799 (Ct. App. 1932), involving dramatization of the song Frankie and Johnnie. Judge Pound observed that although language of the play was coarse, vulgar and profane, the plot tawdry, the play indecent from every consideration of propriety, yet
"the court is not a censor of plays and does not attempt to regulate manners. One may call a spade a spade without offending decency, although modesty may be shocked thereby. * * * The question is whether the tendency of the play is to excite lustful and lecherous desire."
The effect of the book as a whole, its artistic sincerity, the climate of current opinion, the changing nature of moral standards of thought, the fact that the book is not dirt for dirt's sake, the use of the normal person rather than the abnormal as a criterion, the book's literary worth and particularly its reception at the hands of qualified critics  these are some of the elements weighed in determining whether a *315 book was obscene in such lower court cases as People v. Viking Press, 147 Misc. 813, 264 N.Y.S. 534 (1933) [Caldwell's God's Little Acre]; People on Complaint of Sumner v. Miller, 155 Misc. 446, 279 N.Y.S. 583 (1935) [Flaubert's November]; People v. Gotham Book Mart, 158 Misc. 240, 285 N.Y.S. 563 (1936) [Gide's If I Die]; People v. Larsen, 5 N.Y.S.2d 55 (Sp. Sess. 1938) [Life Magazine's "Birth of a Baby"]; People ex rel. Kahan v. Creative Age Press, 192 Misc. 188, 79 N.Y.S.2d 198 (1948) [The Gilded Hearse]; People v. Vanguard Press, 192 Misc. 127, 84 N.Y.S.2d 427 (1947) [Willingham's End As a Man].
The formulation of a reasonable and fairly flexible test still awaits attention by New York's highest court. The courts, generally, have been moderate in their approach to literary obscenity and have, at least on the lower levels, explored modern approaches to the problem and the application of different factors to the resolution of the problem.
Pennsylvania's first obscene book case was Commonwealth v. Landis, 8 Phila. 453 (1870), where defendant was convicted for selling a book entitled Secrets of Generation. The court held that it was for the jury to say whether a book was obscene, and indulged in the not unfamiliar exercise of defining synonyms like obscenity, filthiness, indecency, lewdness and lasciviousness in terms of each other. Lord Cockburn's rule was followed in a number of subsequent minor court decisions. Commonwealth v. New, 142 Pa. Super. 358, 16 A.2d 437 (1940) is considered in Commonwealth v. Gordon, below, as virtually abandoning the harsh test of Regina v. Hicklin. The court in the New case considered the publication "as a whole." Judge Bok's opinion in the Gordon case, 66 Pa. Dist. & Co. 101 (Cty. Ct. 1949), affirmed 166 Pa. Super. 120, 70 A.2d 389 (1950), is the most comprehensive treatment of the law of literary obscenity to date and represents the thoughtful and balanced approach of a philosophical mind to a restatement that will meet the challenge of changing times and morals. After reviewing the decisions he says:
*316 "From all of these cases the modern rule is that obscenity is measured by the erotic allurement upon the average modern reader; that the erotic allurement of a book is measured by whether it is sexually impure  i.e., pornographic, `dirt for dirt's sake,' a calculated incitement to sexual desire  or whether it reveals an effort to reflect life, including its dirt, with reasonable accuracy and balance; and that mere coarseness or vulgarity is not obscenity.
Forging such a rule from the precedents does not fully reach the heart of the matter, * * *. Current standards create both the book and the judgment of it."
He does not see much difference, historically, between censoring books before publication and suppressing them, and regards legal censorship "as an experiment of more than dubious value." In his view, the practice of previous censorship raises grave constitutional questions.
Until the case of United States v. "Ulysses," 5 F. Supp. 182 (S.D.N.Y. 1933), affirmed 72 F.2d 705 (C.C.A. 2 1934), the federal courts exercised censorship through regulation of importations under the Tariff Acts (19 U.S.C.A. § 1305), and by criminal prosecutions under Comstock's act of 1873 declaring certain books and other publications non-mailable matter (18 U.S.C.A. § 334). The orthodox test for obscenity in the Hicklin case was approved by the federal courts in 1879 in United States v. Bennett, 24 Fed. Cas. page 1093, No. 14,571 (S.D.N.Y. 1879), holding obscene Cupid's Yokes, a book dealing with the sex side of marriage. The courts dealt similarly with the novel Hagar Revelly in United States v. Kennerley, 209 F. 119 (S.D.N.Y. 1913), but the case gave Judge Hand the opportunity to express his doubts about the law of obscenity. He declared that the Hicklin rule "however consonant it may be with mid-Victorian morals, does not seem to me to answer to the understanding and morality of the present time, * * *." and went on to say:
"* * * I question whether in the end men will regard that as obscene which is honestly relevant to the adequate expression of innocent ideas, and whether they will not believe that truth and beauty are too precious to society at large to be mutilated in the interests of those most likely to pervert them to base uses. Indeed, *317 it seems hardly likely that we are even to-day so lukewarm in our interest in letters or serious discussion as to be content to reduce our treatment of sex to the standard of a child's library in the supposed interest of a salacious few, or that shame will for long prevent us from adequate portrayal of some of the most serious and beautiful sides of human nature. That such latitude gives opportunity for its abuse is true enough; there will be, as there are, plenty who will misuse the privilege as a cover for lewdness and a stalking horse from which to strike at purity, but that is true to-day and only involves us in the same question of fact which we hope that we have the power to answer."
The defendant in United States v. Dennett, 39 F.2d 564, 76 A.L.R. 1092 (C.C.A. 2 1930), had been convicted of sending through the mails a pamphlet, Sex Side of Life, written for her children and other young people. The jury had been charged in the language of the Hicklin test. In reversing, Judge Augustus N. Hand said there was no case to submit to the jury. Referring to Lord Cockburn's test indirectly, he said that the federal act (18 U.S.C.A. § 334) "must not be assumed to have been designed to interfere with serious instruction regarding sex matters unless the terms in which the information is conveyed are clearly indecent." The court found that the defendant had written about sex with sincerity and held that so accurate an exposition "in decent language and in a manifestly serious and disinterested spirit cannot ordinarily be regarded as obscene."
A book of fiction, daringly experimental in form and prose style, next came before the Second Circuit in United States v. "Ulysses," 72 F.2d 705 (C.C.A. 2 1934), affirming Judge Woolsey below, 5 F. Supp. 182 (S.D.N.Y. 1933). Judge Augustus N. Hand's opinion, in which Judge Learned Hand concurred, is commonly considered a landmark in the law of literary obscenity. The New York customs collector had seized James Joyce's Ulysses under the Tariff Act of 1930 (19 U.S.C.A. § 1305), claiming it was an obscene book. Judge Woolsey dismissed the government's libel for forfeiture. Judge Hand found the book (pp. 706-707)
"* * * a sincere portrayal with skilful artistry of the `stream of consciousness' of all its characters. * * * [It] seems to be *318 sincere, truthful, relevant to the subject, and executed with real art. * * *
* * * The book as a whole is not pornographic, and, while in a few spots it is coarse, blasphemous and obscene, it does not, in our opinion, tend to promote lust. The erotic passages are submerged in the book as a whole and have little resultant effect.
* * * We think the same immunity should apply to literature as to science, where the presentation, when viewed objectively, is sincere, and the erotic matter is not introduced to promote lust and does not furnish the dominant note of the publication."
The rigorous doctrines laid down in United States v. Bennett, above, which followed the Hicklin case, were held inconsistent with the decision of the court in the Dennett case just discussed. The court stated that in applying the "dominant effect" of the book test
"relevancy of the objectionable parts to the theme, the established reputation of the work in the estimation of approved critics, if the book is modern, and the verdict of the past, if it is ancient, are persuasive pieces of evidence; for works of art are not likely to sustain a high position with no better warrant for their existence than their obscene content."
In United States v. Levine, 83 F.2d 156 (C.C.A. 2 1936), defendant had been indicted for posting circulars advertising obscene books, only one, Black Lust, being a literary work. The trial judge charged the jury in terms of the orthodox test, and it found Levine guilty. On appeal Judge Learned Hand, after pointing out that the Hicklin doctrine had been criticized in the Kennerley case, bluntly declared it had been overruled by the Second Circuit in the Dennett and "Ulysses" cases. He emphasized that the test to be applied was that stated in the "Ulysses" decision, and added:
"The standard must be the likelihood that the work will so much arouse the salacity of the reader to whom it is sent as to outweigh any literary, scientific or other merits it may have in the reader's hands; of this the jury is the arbiter."
This summary review of the authorities in five jurisdictions demonstrates that the harsh rule of Regina v. Hicklin, *319 finds little, if any, support in today's judicial thinking. It has been supplanted by a more modern test, stated most clearly in the opinions of the Second Circuit, in Commonwealth v. Gordon, above, and in the latest Massachusetts cases.
We are aware that most of the cases we have discussed involve actual prosecutions for literary obscenity. They are nonetheless useful to our purpose in considering the question of the suppression of books in advance of institution of criminal proceedings.
Serious consideration of what has been written by courts and others in the past two decades emphasizes the arbitrary and dangerous character of what was done here by defendant and his advisory committee. To entrust such censorship to one fallible man, or private body of men, is to set up an "almost despotic arbiter of literary products * * *. Such a condition * * * does not accord with democratic ideals which repudiate thought control." Roth v. Goldman, 172 F.2d 788, 790 (C.C.A. 2 1949). No matter how sincere the intention here, the method and the inevitable result are those of the Watch and Ward Society and its contemporaries. The courts have given their answer to such activity.
The motivating purpose in this case seems to have been to protect school childen from "objectionable" books. This raises the question as to just what the effect of a book upon a young person may be. The answer is best given by the sociologist and psychologist. A quarter of a century ago the Bureau of Social Hygiene of New York sent questionnaires to 10,000 college and normal-school women graduates. 1200 answers were received, and of these, 72 (6%) said they had received their earliest sex information from reading books or pamphlets. Not one mentioned a "dirty" book; listed were the Old Testament (19), the dictionary (8), the encyclopedia, Shakespeare, venereal disease circulars, medical books, Victorian novelists, Motley's Rise of the Dutch Republic. The question, "What things are most stimulating sexually?", brought a variety of replies from women now mature: 218 replied "Man," 95 (or 8%) said books, 40 drama, *320 29 dancing. The list of books ran the whole gamut of literature, including poetry of the Middle Ages. Ernst and Seagle, To the Pure, 234 et seq.
In 1938 the American Youth Commission chose Maryland as a "typical" state for its study of the conditions and attitudes of youth between the ages of 16 and 24. Over 13,500 young people were interviewed. The chief source of sex education for 66% of the boys and 40% of the girls was what friends of their own age had told them. The home and the school were the next chief sources, and about 4% reported they owed most of their information to books. Bell, Youth Tell Their Story (1938).
Research like this is far more informative than a censor's personal opinion. What was done in New York and Maryland should be up-dated and made even more searching. The figures may change somewhat in future studies but those now available raise a serious question as to whether books alone corrupt and deprave the young.
The influences which operate on a child in the swift movement of our society are as infinite as they are varied. One may not single out the printed page as the one source of moral infection. The whole of our social complex is a more proper frame for investigation and study. There one may find many pernicious influences, tangible and intangible, any one of which is more harmful to child, and to adult, than a publication which some may deem obscene. The point has well been made that the censor is no substitute for the home, the church and the school. Individually and in combination they have their responsibilities in molding the mind and character of our young.
The action of defendant here under attack poses a final question in the field of constitutional law. Directly implicated are the First and Fourteenth Amendments to the Federal Constitution.
N.J.S.A. 52:17A-4 (L. 1944, c. 20, § 4) requires the Attorney-General to enforce the provisions of the Constitution "and all other laws of the State, * * *." N.J.S.A. 52:17B-5 (L. 1948, c. 439, § 5) continued this duty. *321 R.S. 2:182-5 (now N.J.S. 2A:158-5) vests in each county prosecutor the same powers, within his county, "as the Attorney-General shall by law be vested with * * *." In proceeding as he did, defendant undoubtedly believed he was carrying out his statutory duty of enforcing the criminal laws of the State  in particular, the laws relating to obscene publications, R.S. 2:140-2 and 3 (now N.J.S. 2A:115-2 and 3). Under color of his office and under color of statutory authority he sent the letters which, in effect, directed that the book in question be withdrawn from circulation and not be "exposed for sale where it can be purchased by school children." We have already held that he had no such authority in law.
The liberty of the press which the First Amendment guarantees against abridgement by the Federal Government is within the liberty safeguarded by the Due Process Clause of the Fourteenth Amendment from invasion by state action. Gitlow v. New York, 268 U.S. 652, 45 S.Ct. 625, 69 L.Ed. 138 (1925); Near v. Minnesota, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931); Lovell v. Griffin, 303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 949 (1938); Joseph Burstyn, Inc. v. Wilson, 343 U.S. 495, 72 S.Ct. 77, 96 L.Ed. 1098 (1952). In its historic connotation, the press comprehends every sort of publication, and the guarantee of a free press covers distribution as well as publication. Lovell v. Griffin, above.
Chief Justice Hughes, in speaking for the court in Near v. Minnesota, said (283 U.S. at page 713, 716, 51 S.Ct. at pages 630, 631):
"In determining the extent of the constitutional protection, it has been generally, if not universally, considered that it is the chief purpose of the guaranty to prevent previous restraints upon publication. * * *

* * * * * * * *
* * * the protection even as to previous restraint is not absolutely unlimited. But the limitation has been recognized only in exceptional cases. * * *

* * * * * * * *
The exceptional nature of its limitations places in a strong light the general conception that liberty of the press, historically considered *322 and taken up by the Federal Constitution, has meant, principally, although not exclusively, immunity from previous restraints or censorship."
Cf. Lovell v. Griffin, 303 U.S. at page 451, 58 S.Ct. 666.
The "exceptional cases" mentioned by the Chief Justice would undoubtedly include, by his own listing, pornography  "dirt for dirt's sake"  against which the requirements of decency may be enforced. But we do not have such a book here. The court has read The Chinese Room in the light of the standards laid down by the more recent cases already noted, and finds the book unobjectionable. It cuts a rather poor and pale figure in the colorful company of recent "historical" novels of the Forever Amber type, which may be found in almost any public or circulating library, fresh from the best-seller lists.
The question of previous restraint in the publication field again came before the Supreme Court in Hannegan v. Esquire, Inc., 327 U.S. 146, 66 S.Ct. 456, 90 L.Ed. 586 (1946), when the Postmaster-General revoked Esquire magazine's second-class mailing permit because, essentially, it did not "contribute to the public good and the public welfare." The court held that the Postmaster-General acted without authority; Congress had not inaugurated even a limited type of censorship in adopting the regulation relating to the format and nature of the contents of a publication entitled to the mailing privilege. There were some, Justice Douglas noted, who felt that Esquire's contents reflected "the smoking-room type of humor, featuring, in the main sex," and others who thought them "racy and risque" and in poor taste. But the power of censorship, he said, "is so abhorrent to our traditions that a purpose to grant it should not be easily inferred." The Justice declared (327 U.S. at pages 157-158, 66 S.Ct. at pages 461-462):
"What is good literature, what has educational value, what is refined public information, what is good art, varies with individuals as it does from one generation to another. * * * But a requirement that literature or art conform to some norm prescribed by an official smacks of an ideology foreign to our system. * * * *323 From the multitude of competing offerings the public will pick and choose. What seems to one trash may have for others fleeting or even enduring values."
The evil of previous restraint was condemned most recently, in the case of motion pictures, in the Burstyn case, 343 U.S. 495, 72 S.Ct. 777, 96 L.Ed. 1098 (1952).
We hold that defendant's action violated the constitutional guarantee of freedom of the press.
Judgment for plaintiff in accordance with the conclusions herein expressed.