**NEW AMERICAN LIBRARY OF WORLD LITERATURE, Inc. v. ALLEN et al.**

**Civ. No. 30167.**

United States District Court
N. D. Ohio, E. D.

Aug. 5, 1953.

Schumann, Asst. Law Director of Youngstown, Youngstown, Ohio, for Chief Allen and other defendants.

McNAMEE, District Judge.

In this action the plaintiff, the New American Library of World Literature, Inc., seeks recovery of damages and a permanent injunction against the defendant, Edward J. Allen, Jr., Chief of Police of the City of Youngstown, Ohio. Plaintiff's claims for relief are grounded upon the alleged unlawful suppression of the distribution and sale of certain of plaintiff's books in the City of Youngstown. This cause was assigned for hearing upon plaintiff's motion for a preliminary injunction. However, by agreement of the parties and with the approval of the court, a final disposition of plaintiff's claims for injunctive relief will be made upon the evidence adduced at the hearing and the briefs and arguments of counsel.

Plaintiff's claims for damages are reserved for final determination on a trial by jury.

Plaintiff is a New York corporation and a publisher of paper-bound pocket-size editions of books, both fiction and non-fiction. As indicated, defendant Allen is Chief of Police of the City of Youngstown, Ohio. Inasmuch as the controversy is essentially one between plaintiff and Allen, identification of or further reference to the other defendants is unnecessary. Virtually all the plaintiff's books are paper-bound pocket-size reprints of de luxe or "hard-cover" editions of books heretofore published by the leading publishing houses of the country. Plaintiff distributes these books nationally through Fawcett Publications of New York. The local distributor of Fawcett in Youngstown, Ohio is the Mahoning Valley Distributing Company, of which Bernard Bloch is the President. The local distributor sells and delivers the books to retail outlets in Youngstown, Ohio. During the year 1952 plaintiff's sales of pocket-size reprints in the country were in excess of forty-million copies.

Early this year the Mahoning Valley Distributing Company removed several of plaintiff's books from the newsstands in

---

Parker Fulton (of Burgess, Fulton & Fullmer) Cleveland, Ohio, and Murray Gartner, New York City, for plaintiff.

H. Herschel Hunt, Law Director of City of Youngstown, Ohio, and P. Richard

Youngstown. Plaintiff alleges this was done by reason of the unlawful conduct of Allen in submitting to Bloch a list of 108 reprints, including eleven of plaintiff's books which Allen considered to be obscene, and threatening Bloch with arrest if these books were not removed from the stands.

In its Complaint plaintiff alleges that the ordinance under authority of which Allen purported to act is unconstitutional as being vague and indefinite; that Allen transcended his powers as Chief of Police, that he misapplied the ordinance in an unlawful and unconstitutional manner; and that plaintiff has been deprived of its property without due process of law; that it has been denied the equal protection of the laws and its right of freedom of the press.

Notwithstanding the multiple claims seriously urged by plaintiff it will be sufficient for the purposes of this proceeding to determine, first, whether the ordinance is constitutional, and, second, if it is, whether Allen acted outside the scope of his powers as Chief of Police to the injury of plaintiff's property rights and civil rights.

Although copies of the eleven books of plaintiff have been received in evidence, the parties have agreed that it is unnecessary for the court to determine whether these books are obscene or immoral in violation of the ordinance.

### The Facts.

There is in effect in the City of Youngstown an ordinance which in substance defines the sale or distribution of obscene and immoral books as a misdemeanor and prescribes a fine and thirty days imprisonment for its violation.

Early in 1953 Chief Allen inaugurated a campaign against the sale of lewd and indecent literature. On January 5 he wrote a letter to Bernard Bloch in which he commented upon the discussions between them since 1948 and Bloch's expressed willingness to remove "objectionable literature and pictures." Reference was also made in this letter to Bloch's agreement to "permit us to act as censors but only to a degree." The letter, which is quite lengthy,

contains additional matter, including the following:

"These books include almost all of the so-called paper backed 'pocket-book' type of magazine, which as a matter of policy, glorify and dwell upon immorality. Admittedly, there are some few which are not in this category, yet so few are they in number that their publication would seem to be a subterfuge designed to whitewash the great bulk of these publications.

\*　\*　\*　\*　\*　\*

Such periodicals must be removed, and failure to act in this matter will result in arrest and prosecution, under the law, and final disposition by the court."

This letter was released for publication in the Youngstown Vindicator. Although in the above-quoted portion of the letter reference is made to pocket-type magazines, Allen testified that by this language he meant "paper-backed books". Immediately upon reading the letter, Bloch communicated with Allen and later made several visits to the office of the Chief of Police. The burden of the conversations between them was that Bloch considered Allen's objection to be too general and that compliance with the directions in the letter would require the removal of practically all paper-backed books. Bloch requested Allen to specify the titles which the Chief considered to be obscene. Thereupon the defendant, assisted by members of his vice squad, commenced an examination of the books. Only a few of the books were read in their entirety by the Examiners. The defendant stated that in forming his opinion he was influenced by the illustrations on the covers of the books and by the content of the "advertising blurbs", and that blasphemy and detailed description of sexual acts— and violation of the second Commandment of God—were among the standards employed by him to determine whether a book was within the proscription of the ordinance. Allen and the vice squad compiled a list of 108 books and 33 magazines. On January 15, 1953 he forwarded this list to Bloch together with a letter requesting that they be removed from the newsstands. Up-

on receipt of the letter Bloch suggested to Allen that the letter be made "stronger" so that the publishers would understand fully the position in which Bloch was placed. Accordingly, on January 16, 1953 Allen sent another letter to Bloch in which he stated that a failure to comply with the request to remove the books and magazines on the list on or before January 29, 1953 would result in arrest and prosecution of the distributor or any dealers who "display or sell their periodicals." On several occasions between January 5 and January 15, 1953 Allen orally notified Bloch that he would be arrested unless all obscene books and magazines were removed. Bloch brought the letters of January 15 and 16, together with the list of 108 books, to the attention of the publishers in New York. On January 28, 1953 lawyers representing several of the publishing houses, including plaintiff, met with Chief Allen at his office in Youngstown. Counsel for Bloch was also present at this meeting. These representatives denied that any of the books on the proscribed list were obscene and attempted to persuade Allen to an acceptance of this view. Counsel for Bloch suggested that a test case be filed. To this Allen agreed. But because of the unwillingness of any distributor or dealer to submit to arrest, nothing came of this suggestion. The lawyers for the publishing houses also suggested "an area of compromise" which contemplated the withdrawal from sale of some of the books on the list. This suggestion was rejected by Allen. However, Allen did indicate that he would re-examine the list and give the publishers time in which to submit "materials" in support of their contention that the books were not obscene. Within a week after the meeting with counsel for the publishers Allen 'phoned Bloch and said that he was not going to permit the publishers to select a certain number of books,—"This sort of compromise thing that they talked about— and still leave some on that we felt were in violation." Allen stated: "In other words, I wanted every book that we felt violated the law taken off." Thereupon Bloch informed the publishers that he was removing the books from his dealers' stands. The

108 books, including the eleven published by plaintiff, were thereupon withdrawn from sale. Since that time none of the 108 books have been sold in Youngstown.

At the time he wrote the letters of January 15 and January 16 Allen was not prepared to arrest and prosecute if his demand for the removal of the books was rejected. He stated that the "prosecution stage" had not been reached and that if and when it became necessary to prosecute, he would obtain the advice of the city prosecutor before proceeding. It should be noted that on several occasions before the books were removed, Bloch told Allen that only a court had the right to determine whether the books were obscene or immoral.

Allen learned of the work being done by Inspector Case of Detroit, Michigan in connection with the prevention of the sale of obscene literature in that city. On January 26, 1953 Allen wrote to Case asking for advice and assistance and for a copy of any "lists of magazines, comic books and pocket-size books that we could peruse." In this letter Allen also made reference to the Youngstown list which he had prepared, and in connection therewith stated: "We have tentative list prepared which the vice squad has cited as obscene in their opinion. The list is not all-inclusive and indeed there may be some listed that do not warrant removal." On February 3 Inspector Case replied to Allen's letter and submitted two lists of books, one of which was described as "a list of pocket-size books which the Wayne County prosecutor and the censor bureau considered to be a violation of the Michigan State statute * * * governing obscenity." This list comprised about 140 books. The second list contained about 195 titles and was said by Inspector Case to contain books "of an objectionable nature but which are not in the prosecutor's opinion actually obscene within the meaning of the state law." On February 16, 1953 Allen forwarded to Bloch a single list of 335 titles which contained all the publications appearing on the two lists which Allen had received from Inspector Case. This second list included 28 titles

published by plaintiff. The list was accompanied by a letter from defendant which contained a request that the publications on the list be removed from the newsstands of the City of Youngstown, Ohio. In the early part of February Allen was approached by representatives of the Federated Women's Clubs of Youngstown, who made known their desire to assist him in his campaign against indecent literature. Allen suggested that these women form a committee to screen literature, and he appeared before the federation and spoke upon the proposed function of such a committee. Discussions looking to the organization of the committee were being had at the time Allen forwarded the second list of 335 books to Bloch, and it was the defendant's purpose to enlist the aid of the committee in screening books, including those on the lists defendant had received from Inspector Case. It also became known about this time that the plaintiff contemplated legal action against Chief Allen. None of the books on the second list were removed from the dealers' stands in Youngstown.

The evidence discloses that none of the eleven books published by plaintiff which were on Allen's first list were on the lists prepared by Inspector Case of Detroit. It also appears that seven of the eleven books appearing on the first list are available in hard-cover editions in the Youngstown Public Library.

■ The defendant argues that plaintiff cannot maintain this action because the alleged unlawful conduct of defendant was directed against the local distributor and not against plaintiff. But it has been held that parties whose legal rights have been violated by unlawful public action may seek relief although such action made no direct demands upon them. Joint Anti-Fascist Committee v. McGrath, 341 U.S. 123, 71 S.Ct. 624, 95 L.Ed. 817.

Is the Ordinance Constitutional?

The Youngstown ordinance provides:

"Obscene Books, Etc. Any person who shall distribute, sell or expose for sale, or give away any books, papers, pictures and periodicals or advertising matter of any obscene or immoral nature, shall be fined in any sum not exceeding one hundred dollars or imprisoned for not more than thirty days, or both. (Code 1925, No. 305.)"

The plaintiff's first attack upon the validity of the ordinance is based upon the contention that the word "obscene" is unconstitutionally vague and uncertain. In support of this contention plaintiff relies chiefly upon dicta in the opinions of State courts of inferior jurisdiction. Plaintiff, however, cites no case, nor has one been found, where a court has held the word "obscene", as used in a criminal statute, to be so vague in meaning as to offend against the constitutional requirements of certainty. It is true that in Bantam Books, Inc. v. Melko, 1953, 25 N.J. Super. 292, 96 A.2d 47 and in Commonwealth v. Gordon, 66 Pa.Dist. & Co.R. 101 there are dicta expressing opinions on the supposed inherent vagueness of the word "obscene", but in neither of the cited cases was it held that the applicable statute was unconstitutional. Plaintiff interprets expressions of the Supreme Court in Joseph Burstyn, Inc., v. Wilson, 343 U.S. 495, 72 S.Ct. 777, 96 L.Ed. 1098, as a repudiation of the court's dicta in earlier cases that the meaning of the word "obscene" is sufficiently precise to meet constitutional standards. Plaintiff's arguments are overborne by the impressive weight of statements of the opposite view in the opinions of the Supreme Court of the United States.

In Winters v. People of State of New York, 333 U.S. 507, 68 S.Ct. 665, 92 L.Ed. 840, the issue before the court was whether subsection 2 of section 1141 of the New York Penal Law, McK.Consol.Laws c. 40, prohibiting the sale and distribution of magazines principally made up of criminal news and police reports was so vague as to violate the Fourteenth Amendment by prohibiting acts within the protection of the constitutional guarantees of free speech and free press. Subsection 1 of section 1141 of the New York law, which, among other things, proscribes the sale and distribution of obscene publications, was not in issue, but was quoted in full in note

2 of the opinion. After three separate arguments on the merits the court held that the subsection in issue was vague and uncertain, but, fearful lest its decision might be misinterpreted, as implying the opinion that subsection 1 of the New York law, proscribing the circulation of obscene literature, also was vague and unconstitutional, the court said:

> "To say that a state may not punish by such a vague statute carries no implication that it may not punish circulation of objectionable printed matter, assuming that it is not protected by the principles of the First Amendment, by the *use of apt words to describe the prohibited publications. Section 1141, subsection 1, quoted in note 2, is an example.* Neither the states nor Congress are prevented by the requirement of specificity from carrying out their duty of eliminating evils to which, in their judgment, such publications give rise." 333 U.S. at page 520, 68 S.Ct. at page 672. (Emphasis supplied.)

It would be difficult to find a more definite disclaimer of intention to impute uncertainty and vagueness to the word obscene than is contained in the above declaration of the Supreme Court. In the Winters case the court also referred to the words obscene, lewd, lascivious, filthy, indecent, or disgusting as "well understood through long use in the criminal law". Again, 333 U.S. at page 510, 68 S.Ct. at page 668 in the Winters case, in referring to publications not protected by the guaranty of the freedom of the press, the court said: "They are equally subject to control if they are lewd, indecent, obscene or profane." See also Ex parte Jackson, 96 U.S. 727–736, 24 L.Ed. 877; Chaplinsky v. State of New Hampshire, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031; Near v. State of Minnesota, 283 U.S. 697, 716, 51 S. Ct. 625, 75 L.Ed. 1357.

█ Plaintiff misinterprets the rationale and effect of Joseph Burstyn, Inc., v. Wilson, 343 U.S. 495, 72 S.Ct. 777, 782, 96 L. Ed. 1098, in an attempt to demonstrate that there the Supreme Court repudiated—

"its previous hasty dictum to the effect that the word 'obscene' is sufficiently definite for use in a criminal statute." (Pl. Brief)

In the Burstyn case the Supreme Court pointed out that the State has no legitimate interest in protecting any religion from views distasteful to it and that "It is not the business of government in our nation to suppress real or imagined attacks upon a particular religious doctrine, whether they appear in publications, speeches, or motion pictures." But indisputably it is the business of government to protect the public morals. This is the purpose sought to be subserved by the enactment of laws proscribing the sale of obscene publications or the showing of obscene films. And, as the Supreme Court recognized in the Burstyn case, this is an entirely different purpose than that of protecting a particular religious doctrine from "sacrilegious" attack. It thus appears that the trend of authoritative judicial thinking supports the view that the word "obscene" as used in a criminal statute or ordinance is sufficiently precise to meet the constitutional standards of certainty.

█ The ordinance here in question prohibits the sale of publications that are "obscene or immoral." Plaintiff also contends that the word "immoral" is vague and indefinite. The argument submitted in support of this contention merits but brief comment. In Mutual Film Corp. v. Ohio Industrial Commission, 236 U.S. 230 at pages 245–246, 35 S.Ct. 387, at page 392, 59 L.Ed. 552, the Supreme Court declared that the words "educational, moral, amusing, or harmless * * * get precision from the sense and experience of men, and become certain and useful guides in reasoning and conduct." While that part of the decision of Mutual Films that held motion pictures not to be included within the guarantees of free speech and free press was overruled in Burstyn v. Wilson, supra, there was no disapproval in the later case of the above quoted language from Mutual Films. In Superior Films, Inc., v. Department of Education, 159 Ohio St. 315, 112 N.E.2d 311, 319, the Ohio

830

Supreme Court approved the statutory criterion for the censorship of films that required them to be of a "moral, educational, or amusing and harmless character", Gen.Code, § 154–47b, and characterized the definition of crimes in Secs. 13035 and 13040 of the General Code of Ohio, wherein the word "immoral" appears, as being "sufficiently clear." The meaning of the word "immoral" as used in the ordinance, placed as it is in juxtaposition to the word "obscene", is not unconstitutionally vague or uncertain.

Finally, plaintiff argues that the ordinance, which prohibits the sale of books "of *any* obscene or immoral nature," prescribes an unconstitutional test of obscenity in that it prohibits the sale of books which may contain but a single or isolated passage of obscenity. In support of this branch of its argument plaintiff relies upon State v. Lerner, 1948, 81 N.E.2d 282, 285, decided by the Common Pleas Court of Hamilton County, Ohio. The Lerner case deals with the explicit terms of the 1943 amendment of Section 13035 of the General Code of Ohio, which both in text and in its purpose, as judicially declared, is substantially different from the Youngstown ordinance. Section 13035, G.C. of Ohio includes within the prohibited media "an obscene, lewd or lascivious book, magazine, pamphlet, paper, writing, advertisement, circular, print, picture, photograph, motion picture film". By the amendment of 1943 there was added, "or book, pamphlet, paper, magazine not wholly obscene but containing lewd or lascivious articles, advertisements, photographs or drawing, representation, figure, image, cast, instrument or article of an indecent or immoral nature". The Common Pleas Court held that by the language of the main part of the statute first above quoted, the Legislature adopted the modern test of obscenity that requires a consideration of the book as a whole to determine whether it is obscene, and that the sole purpose of the 1943 amendment was to "outlaw in [Ohio] the 'wholly obscene' test for 'books, papers, pamphlets and magazines' ". It cannot be said, however, that

the Youngstown ordinance sought to outlaw the wholly obscene test for books. The ordinance was adopted in 1925, which was eight years before the decision in United States v. One Book "Ulysses", D.C., 5 F.Supp. 182, wherein Judge Woolsey laid down the modern test that obscenity is to be determined by the effect of a book read in its entirety upon a person with average sex instincts. The "Ulysses" case has been recognized as the keystone of the modern American rule that indictable obscenity must be "dirt for dirt's sake." Commonwealth v. Gordon, 66 Pa.Dist. & Co.R. 101, at page 128. When the Youngstown ordinance became effective the test of obscenity in this country and in England was Lord Cockburn's famous pronouncement in Regina v. Hicklin, L.R. 3, Q.B. 360 (1868):

"I think the test of obscenity is this, whether the tendency of the matter charged as obscenity is to deprave and corrupt those whose minds are open to such immoral influences, and into whose hands a publication of this sort may fall."

In recent years Lord Cockburn's test has been severely criticised by both federal and state judges in this country. It was said that, strictly applied, the test proscribed books containing obscene passages the tendency of which was to corrupt the minds of those most susceptible to immoral influences. It was observed that under this test not even the Great Books were exempt. But while Lord Cockburn's test was criticised, it was not thought to be unconstitutional. As late as 1913 Judge Learned Hand applied Lord Cockburn's test because "that test has been accepted by the lower federal courts until it would be no longer proper for me to disregard it." United States v. Kennerley, D.C., 209 F. 119, at page 120.

The English rule was supplanted by the modern test in 1933 and is stated in United States v. One Book Entitled "Ulysses" by James Joyce, 2 Cir., 72 F.2d 705, 707, where the Circuit Court of Appeals approved and elaborated Judge Woolsey's pronouncement as follows:

"We think the same immunity should apply to literature as to science, where the presentation, when viewed objectively, is sincere, and the erotic matter is not introduced to promote lust and does not furnish the dominant note of the publication. The question in each case is whether a publication taken as a whole has a libidinous effect."

It is true that the Youngstown ordinance may be construed in harmony with the older rather than the modern test of obscenity. The language "of any obscene or immoral nature" is susceptible of the interpretation that the prohibition is against the sale of books that merely contain some obscenity. But the ordinance may also be construed as referring to a book which, considered as a whole, has a libidinous effect. It is a well settled rule of construction that where there are two possible interpretations of a statute or ordinance, by one of which the law would be unconstitutional and by the other it would be valid, a court should adopt the construction that will uphold the law. 11 Am.Jur. 725–728. Among its other connotations the word "any" means "an". The ordinance may be read as proscribing books of an "obscene or immoral nature." Such a construction does not preclude the application of the modern test of obscenity or any other test which the courts of Ohio may deem to be controlling. This interpretation of the language of the ordinance is in harmony with the provisions of Sec. 3663, G.C. of Ohio which confers powers upon municipalities to prohibit the sale of obscene literature. Indeed, as thus construed, the descriptive terms of the ordinance are identical with those of Sec. 3663, G.C., which reads in part:

"To restrain and prohibit the distribution, sale and exposure for sale of books * * * of an obscene or immoral nature."

I am of the opinion that on its face the ordinance is constitutional and valid. Did the Defendant Allen Transcend His Powers and Violate the Property Rights and Civil Rights of the Plaintiff?

It is the settled policy of courts of equity not to restrain the enforcement of a criminal statute or ordinance even though the legislation be unconstitutional because such invalidity may be interposed as a complete defense in a criminal action. 28 Am.Jur. 372, Sec. 183; 43 C.J.S., Injunctions, § 156, page 768. Equity will deviate from this general policy only in those exceptional circumstances where restraint of the enforcement of an invalid statute or ordinance is necessary to effectively protect the property rights or civil rights of the complaining party. More compelling reasons underlie the policy that precludes equity from restraining the enforcement of a valid statute or ordinance. But this rule likewise is not absolute. Where public officers charged with the enforcement of a valid criminal law exceed their lawful powers and by arbitrary action cause or threaten to cause irreparable injury to property rights or civil rights of the complainant, equity will intervene. 28 Am. Jur. 373, Sec. 185; id. 421, Sec. 238; 43 C.J.S., Injunctions, § 111, page 634.

The enforcement of an ordinance that prohibits the distribution and sale of obscene or immoral publications presents difficulties seldom encountered in the enforcement of criminal law. Ordinarily local distributors and dealers are respected citizens engaged in reputable businesses. The distributor who handles thousands of books cannot be expected to read them. Nor can the retail dealers who customarily sell pocket-size books as a sideline be expected to know their contents. The publishers, however, read every book that is offered for sale. So when an obscene publication is displayed on the bookstands, it is the publisher, acting with guilty knowledge, who is the real offender. The publisher, however, is usually resident elsewhere and not subject to prosecution in the local courts. Local distributors and dealers are poorly equipped to defend against a criminal charge. Moreover, they are anxious to avoid the odium and embarrassment of an accusation that implies a disregard for the primary considerations of public decency and morality. Consequently they are quick to yield to the demands of a

police officer that allegedly lewd and obscene publications be withdrawn from sale. This was the situation in Youngstown. Experience demonstrates that similar factors control wherever local prosecutions are threatened for violation of laws against selling obscene publications. See Bantam Books, Inc., v. Melko, 25 N.J. Super, 292, 96 A.2d 47; American Mercury, Inc., v. Chase, D.C., 13 F.2d 224, 225. In the last cited case the court enjoined the Watch and Ward Society of Massachusetts from threatening to prosecute dealers in magazines and books if the publications in question were not withdrawn from sale. The court held that an unofficial organization was without power to impose its views upon the dealers through threats of prosecution. The rationale of the decision appears in the following:

"The injury to the persons affected does not flow from any judgment of a court or public body; it is caused by the defendants' notice, which rests on the defendants' judgment. The result on the other person is the same, whether that judgment be right or wrong; i. e., the sale of his magazine or book is seriously interfered with. Few dealers in any trade will buy goods after notice that they will be prosecuted if they resell them. Reputable dealers do not care to take such a risk, even when they believe that prosecution would prove unfounded. The defendants know this and trade upon it. They secure their influence, not by voluntary acquiescence in their opinions by the trade in question, but by the coercion and intimidation of that trade, through the fear of prosecution if the defendants' views are disregarded."

While the above-cited case involved no action of a public official, it sheds light on the issue here presented for determination. Where public officers exceed their lawful powers they no longer act as duly authorized agents of government. In such cases they act with no greater legal authority than private persons or private organizations. The defendant Allen possessed no lawful power to suppress publications under threat of prosecution.

In Dearborn Pub. Co. v. Fitzgerald, D.C., 271 F. 479, 482, the Mayor and Chief of Police of Cleveland, acting under color of an ordinance proscribing the sale of obscene and scandalous literature, threatened agents of a publishing company with arrest if future editions of the newspaper were sold on the streets of Cleveland. In enjoining the city officials from continuing such threats, Judge Westenhaver of this court said:

"The publication complained of cannot by any stretch of the imagination be classified as indecent, obscene, or scandalous; but it if were, the limit of the city's power would be to conduct a prosecution for the specific offense thus committed, and not the establishment of a censorship in advance of future publications, and prohibition generally of the sale thereof upon the streets, in the same manner as other publications may be sold."

The Youngstown ordinance confers no greater powers upon the Chief of Police than did the Cleveland ordinance under review in Dearborn Pub. Co. v. Fitzgerald, supra. Judge Westenhaver's views in the cited case that censorship of an obscene newspaper in advance of publication would be unlawful and that the city's power was limited to prosecution for specific offenses, are pertinent here.

Freedom of the press is not limited to freedom to publish, but includes the liberty to circulate publications, which the Supreme Court has said "is as essential to that freedom as liberty of publishing". Lovell v. City of Griffin, 303 U.S. 444, 58 S.Ct. 666, 669, 82 L.Ed. 949. In the Lovell case the court again stressed the importance of protecting freedom of the press "from every sort of infringement". See also Near v. State of Minnesota, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357; Grosjean v. American Press Co., 297 U.S. 233, 56 S.Ct. 444, 80 L.Ed. 660; De Jonge v. State of Oregon, 299 U.S. 353, 57 S.Ct. 255, 81 L.Ed. 278. Freedom of the press, together with freedom of speech and freedom of religion, occupy a "preferred position" among our constitutional guaranties. Marsh v. State of

Alabama, 1946, 326 U.S. 501, 509, 66 S.Ct. 276, 90 L.Ed. 265; Jones v. City of Opelika, 1943, 319 U.S. 103, 63 S.Ct. 890, 87 L.Ed. 1290; Murdock v. Com. of Pennsylvania, 1943, 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292; Martin v. City of Struthers, 1943, 319 U.S. 141, 63 S.Ct. 862, 87 L.Ed. 1313. That preferred position gives these guaranties "a sanctity and a sanction not permitting dubious intrusions." Thomas v. Collins, 323 U.S. 516, at page 530, 65 S.Ct. 315, 89 L.Ed. 430. Freedom of the press is also guaranteed by the Constitution of the State of Ohio. Censorship in any form is an assault upon freedom of the press. A censorship that suppresses books in circulation is an infringement of that freedom.

In Bantam Books, Inc., v. Melko, 25 N.J.Super. 292, 96 A.2d 47, it was held that the prosecutor of Middlesex County was without power to order a local distributor to discontinue the sale of books which the Middlesex County committee found "to be of such nature that they should be withdrawn from circulation." The list of publications accompanying the prosecutor's letter to the distributor contained 36 titles, five of which were books published by the plaintiff, Bantam Books, Inc. Although there was no demand by the prosecutor that the books be withdrawn from sale, and the letter contained no threat of prosecution, the distributor considered it to be a "mandate" and removed all of the books on the list from the dealers' stands. Thereafter representatives of the plaintiff conferred with the prosecutor and the committee. As a result of these conferences and a re-examination of the books, four of plaintiff's titles were stricken from the list. As to the fifth book, the prosecutor wrote to counsel for the plaintiff expressing his concurrence in the committee's view that the book ought not to be sold in Middlesex County. In holding the action of the prosecutor to be illegal the court did not base its decision on the fact that an unofficial committee acted as a censor of the publications. The court held that the opinions of the committee were adopted by the prosecuting attorney. In this connection the court said:

"It cannot be argued that the censorship exercised here was not that of the prosecutor, but rather of the Middlesex County Committee on Objectionable Literature. The committee may have advised; the defendant acted. No statutory authority exists for what was done. The Legislature has not yet clothed the county prosecutors or the Attorney General, with the power to censor books and so there is no occasion to consider the possible constitutionality of such legislation."

The New Jersey court held that the letters of the prosecutor contained implied threats of prosecution and granted plaintiff's prayer for injunctive relief. In many respects the Melko case is analogous. But here there was no such careful examination of the books as was made by the committee in Melko. On the contrary, the record discloses a hasty application of subjective standards that raises serious questions as to the correctness of the examiners' findings. Even the defendant conceded that there may have been some books on the first list that might well have been omitted. Yet two days after he made this concession to Inspector Case he refused to consider the suggestion of counsel for the publishers that some books be withdrawn from the list. As he later told Bloch, his purpose was to suppress the sale of all books that he felt violated the ordinance. The defendant's demand for the removal of the books was made before he obtained the legal advice necessary to assure him that probable cause for prosecution existed. These circumstances, together with the inclusion in the second list of 195 titles which in the Wayne County prosecutor's opinion were not in violation of the Michigan statute, constitute fair warning that, unless restrained, the defendant will continue his unlawful exercise of the powers of censorship.

The defendant was without authority to censor books. Such a drastic power can be vested in a police officer only by a valid express legislative grant. As Chief of Police it was defendant's duty to examine the suspected publications to determine whether there was probable cause for prosecution. He was without authority to determine with finality whether the books were obscene or

834

immoral in violation of the ordinance. In the event prosecutions were undertaken, the burden would rest upon the city officials to establish by proof beyond a reasonable doubt every element of the offense, including the obscene or immoral nature of the books. Until a court of competent jurisdiction adjudged a book to be obscene or immoral, there would exist no warrant in law for its suppression.

■ Not only did the defendant exceed his lawful powers in suppressing the publications, but the methods he employed in censoring the books were arbitrary and unreasonable. This is not to impugn the defendant's sincerity of purpose or his praiseworthy ambition to suppress lewd and indecent literature. But a Chief of Police, like all other public officials, must act within the scope of his express and implied powers under the law. So important is the principle it expresses that it never becomes trite to say "Ours is a government of laws and not of men." It is the duty of courts to protect the integrity of this principle. The judicial office has no higher function to serve than the restraint of official arbitrariness. Arbitrary power inspired by good motives, no less than that animated by evil intent, is an attack upon the supremacy of the law. It is of the utmost importance to prevent the distribution of all forms of lewd and indecent literature with its demoralizing effect upon the young. It is vital in the interest of public morality that the laws against obscenity be vigorously enforced. But if a free society is to endure, its primary obligation is to protect its "government of laws" from all intrusions of arbitrary power.

Defendant seeks to justify his censorship of books by claiming that this was done pursuant to an agreement with Bloch. I find no evidence of such an agreement. Bloch acted under duress, and he repeatedly told Allen that only a court could determine whether a book was obscene or immoral. Nor is there any merit to the argument that plaintiff is estopped. On the only occasion when representatives of the publishers dealt with the defendant they protested his action as being illegal. There is no basis for the claim of estoppel.

■ Plaintiff has been deprived of a property right without due process of law. It has suffered loss incapable of accurate measurement in an action at law. In that sense plaintiff has sustained irreparable injury and is threatened with further loss of serious dimensions.

For the reasons assigned, it is held that defendant's conduct in ordering the suppression of plaintiff's books under threat of arrest and prosecution of the dealers and the distributor was in excess of his lawful powers under the ordinance. A decree may be drawn restraining the defendant from engaging in such unauthorized conduct.

No restraint is imposed upon defendant's power to enforce the ordinance by arrest and prosecution, or by other means within the scope of his lawful powers. Plaintiff's other requests for injunctive relief are denied.

■ If the defendant has published any libel of plaintiff's books, an issue that is not here considered or decided, plaintiff has an adequate remedy at law.